UNITED STATES of America

v.

LOCAL 30, UNITED SLATE, TILE AND COMPOSITION ROOFERS, DAMP AND WATERPROOF WORKERS AS-SOCIATION, Residential Reroofers Local 30B, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, Stephen Traitz, Jr., Edward P. Hurst, Michael Mangini, Robert Crosley, Michael Daly, Daniel Cannon, Mark Osborn, Robert Medina, Ernest Williams, James Nuzzi, Stephen Traitz, III, Joseph Traitz, and Richard Schoenberger.

Civ. A. No. 87–7718.

United States District Court,
E.D. Pennsylvania.

May 23, 1988.

Edward S.G. Dennis, Jr., U.S. Atty., Edward T. Ellis, Catherine Votaw, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

Richard Markowitz, Stephen Richman, Ronald Kidd, Edward Daly, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is the motion of the United States for a preliminary injunction and appointment of a trustee *pendente lite*. For the reasons stated herein, the motion for a preliminary injunction will be granted to the extent set forth, and the motion for appointment of a trustee will be denied.

## INTRODUCTION

On December 2, 1987, plaintiff United States of America ("United States" or "the government" or "plaintiff") filed a complaint and a motion for a preliminary injunction seeking appointment of a trustee *pendente lite* under the civil injunctive provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). The United States also requests that defendants Stephen Traitz, Jr. ("Traitz"), Edward P. Hurst ("Hurst"), Michael Mangini, a/k/a "Nails" ("Mangini"), Robert Crosley ("Crosley"), Michael Daly ("Daly"), Daniel Cannon ("Cannon"), Mark Osborn ("Osborn"), Robert Medina ("Medina"), Ernest Williams ("Williams"), James Nuzzi ("Nuzzi"), Stephen Traitz, III ("Traitz III"), Joseph Traitz and Richard Schoenberger ("Schoenberger") be enjoined from holding office or participating directly or indirectly in the affairs of defendant Locals 30 and 30B, United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association and its affiliated benefit plans (hereinafter collectively referred to as "the Roofers Union" or "the Union") and for the court to appoint a trustee *pendente lite* to conduct the affairs of the Roofers Union.

On November 23, 1987, a federal court jury in this district returned a verdict in a criminal action against the thirteen officers and employees of the Roofers Union who are named defendants in this civil action. The defendants were found guilty of conducting and participating in the affairs of the Roofers Union through a pattern of racketeering activity (substantive RICO offense), RICO conspiracy, bribery of federal, state and local public officials, mail fraud, extortion, illegal kickbacks from providers to an employee benefit plan, embezzlement from the employee benefit plan and collection of debts for organized crime.

The parties introduced evidence at a preliminary injunction hearing that began on December 16, 1987 and continued with several breaks to completion on February 5, 1988. The parties were given until March

15, 1988 to submit final proposed findings of fact and conclusions of law. On March 15, 1988 the court took the matter under advisement.

Plaintiff presented its evidence in three parts: (1) the testimony of approximately fifty (50) fact witnesses who described improper and/or illegal acts allegedly committed by the individual defendants and/or the Union and/or members or supporters of the Union; (2) approximately eleven (11) of the audio tapes that were recorded in accordance with the Title III wiretap Order authorized in conjunction with the federal criminal trial of the individual defendants (*United States v. Traitz, et al.,* Criminal No. 86–451) (although the court received into evidence the entire set of 271 transcripts from the criminal proceeding); and, (3) the testimony of expert witness, law professor Clyde W. Summers. Plaintiff's evidence was received almost entirely without contradiction except for a few scattered episodes of primarily cosmetic and unrevealing cross-examination. Plaintiff's evidence thus stands virtually unchallenged.

The thirteen individual defendants were collectively represented by Ronald Kidd, Esquire until February 1, 1988, when Edward Daly, Esquire took over the representation of his brother Michael Daly and Mr. Kidd continued to represent the other twelve individual defendants. The individual defendants presented the testimony of approximately one dozen witnesses and the stipulated testimony of two (2) other persons to vouch for the individual defendants' character and in regard to the extent of a possible injunction, their need to continue to be able to work as roofers in the geographic jurisdiction covered by the Union.

The defendant Union presented the testimony of approximately nine (9) witnesses including expert witness, business school professor Janice R. Bellace, and the stipulated testimony of two (2) other persons. The Union's attorney, Bernard N. Katz, Esq., was replaced with the consent of the

court and Mr. Katz, by Richard H. Markowitz, Esq. during the hearing.

The United States contends that the convictions of the thirteen defendants in the criminal action, the evidence presented in this action and the expert testimony of Prof. Clyde W. Summers prove by a preponderance of the evidence that absent the injunctive relief requested including the removal of the current newly-elected officers of the Union and the imposition of a trusteeship, the persuasive and longstanding pattern of racketeering activity is likely to continue in the Roofers Union.[1] The thirteen individual defendants oppose the injunctive relief sought and in any event ask the court to allow them to be allowed to work as roofers in the geographic jurisdiction covered by the Union. Defendant Roofers Union opposes removal of the current officers of the Union and the imposition of a trusteeship. Defendant Roofers Union asks the court to deny all the injunctive relief plaintiff seeks and preserve the status quo or at most to impose some sort of limited monitorship whereby the current officers would continue to run the Union but would be monitored by a court-appointed official. For the reasons stated herein the court will not grant the relief plaintiff has requested, nor will it preserve the status quo as defendants request; instead it will grant what it considers to be the appropriate injunctive relief to protect the Union, its members and the public.

## FINDINGS OF FACT

### A. Background

1. The Roofers Union is a labor organization headquartered at 6447 Torresdale Avenue in Philadelphia, Pennsylvania, that represents approximately 2,000 persons employed in eastern Pennsylvania, southern New Jersey and Delaware. At all times relevant to this action, the members of the Roofers Union have been employed in an enterprise affecting interstate commerce within the meaning of RICO, 18 U.S.C. § 1961; the Labor–Management Re-

---

**1.** Section 1964(d) provides a statutory estoppel barring the individual convicted defendants from denying the essential elements of the criminal offense in a subsequent civil proceeding.

*See* n. 10, *infra.* In addition, defendants failed to contradict almost all of that part of the government's evidence which defendants are not statutorily estopped from denying.

porting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401, *et seq.;* and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* [Govt.Exh. 21].

2. The Roofers Union has, since at least the 1960's, negotiated collective bargaining agreements with two employer associations in the Philadelphia area. Local 30 (which has also been referred to by some as Local 30A), is the commercial roofing segment of the Union and has had an agreement with the Roofing and Sheet Metal Contractors Association of Philadelphia and Vicinity. Local 30B, the residential reroofing part of the Union, was formed in 1969 and has since that time had an agreement with the Roofing Metal and Heating Associates, a contractors' association. These agreements are re-negotiated approximately every three years, but terms other than wage and fringe benefit rates have remained essentially the same since the 1960's. [Exhs. D–11, D–12].

3. The Roofers Union purports to be governed by the Constitution and Bylaws of the United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Association, an international labor organization, and the Local 30/30B Constitution and Bylaws. [Govt.Exhs. 20A, 20B].

4. The Constitution of the Roofers Union created the following offices:

Business Manager
President
Vice President
Recording Secretary
Five Executive Board Members

The chief executive of the Union is the business manager. [Govt.Exh. 20B, p. 16].

5. The Constitution and Bylaws of the Roofers Union provide that all officers are elected by and from the membership of Locals 30 and 30B. [Govt.Exh. 20B].

6. There has not been a contested election (*i.e.,* more than one candidate) for the office of business manager in at least the past twenty years, except during this suit in December 1987. [N.T. 1007].

7. The Roofers Union also employs salaried business agents and organizers, who are appointed by the business manager. The duties of business agents and organizers include obtaining the agreement of non-Union roofing companies to become signatories to one of the industry-wide collective bargaining agreements; ensuring compliance with those agreements; and handling problems for members either in their employment or in relation to the Union benefit plans.

8. The Roofers Union is associated with the following employee benefit plan funds that are subject to federal regulation:

(a) Local 30 Pension Fund
(b) Local 30B Pension Fund
(c) Local 30 Health and Welfare Fund
(d) Local 30B Health and Welfare Fund
(e) Local 30 Pre–Paid Legal Services Fund
(f) Local 30B Pre–Paid Legal Services Fund
(g) Local 30 Vacation Fund
(h) Local 30B Vacation Fund

9. Officers of the Roofers Union sit on the boards of trustees of each of the funds identified above. An equal number of management trustees sit on each fund except for the two Vacation Funds, which are controlled solely by the Union.

B. *Union Violence Against Roofing Contractors To Coerce Unionization*

10. Beginning in approximately 1968, the leaders of the Roofers Union conceived a plan to govern and exploit the roofing industry in the Philadelphia area by forcing roofing companies to sign collective bargaining agreements with the Roofers Union and to operate their businesses in a manner that suited the Union leadership. The plan included use of physical coercion, violence, threats of violence, and terrorism to extort agreements from non-Union and Union contractors alike, and use of arson and violence to drive out of business any contractor who refused to submit to Roofers Union control. [Findings of Fact 10–56].

11. The leaders of the Roofers Union and the sponsors of this policy at that time

included William Stearn ("Stearn"), John McCullough ("McCullough"), Jack Kinkade, and Traitz.[2] Stearn was convicted in 1972 in this court of Hobbs Act extortion (18 U.S.C. § 1951), and was required to give up his Union office by virtue of 29 U.S.C. § 504. [Govt.Exhs. 21, 22A].

12. In about 1968 or 1969, the Roofers Union hosted a meeting of approximately 100 contractors at the Rifle Club on Tabor Road in Philadelphia. Two of the contractors present were Richard Kaller, of Kaller Roofing Company, Ardmore, Pennsylvania, and Thomas Hudecheck, of Hudecheck Roofing, Downingtown, Pennsylvania, both of whom testified as witnesses for the government at the preliminary injunction hearing. [For a more detailed recitation of the Union interaction with the Kaller Roofing Company and Hudecheck Roofing, *see* *Findings of Fact* 24–34 and 75–78, *infra,* respectively.] At the Rifle Club meeting, McCullough and Traitz attempted to obtain the agreement of the approximately 100 contractors present to the industry-wide collective bargaining agreement for residential roofers. When certain contractors objected, McCullough stated, "Get that guy's name." The Union leaders of the meeting threatened the contractors that failure to agree would cause the Union to resort to physical retaliation against such contractors including stealing the contractors' ladders while workers were on a roof, breaking their equipment, burning their shops, and attacking them with baseball bats. Union officials made these threats over an open microphone to the approximately 100 contractors at the meeting. [N.T. 141–145, 297–99].

13. During the months and years after the 1968 or 1969 Rifle Club meeting, the leadership of the Roofers Union carried out many of the threats made at that meeting, as part of official Union policy.

*Altemose Construction Company*

14. On June 5, 1972, the Roofers Union played a leading role in the unlawful intrusion and physical destruction of an Altemose Construction Company ("Altemose") jobsite at Valley Forge, Pennsylvania.

Altemose was a large non-Union builder. Traitz and other leaders of the Roofers Union arranged for the rental of seven buses that arrived in a caravan with other vehicles on the Valley Forge jobsite at 7:30 a.m. The vehicles discharged approximately 1,000 men, many of whom were officers or members of the Roofers Union, who proceeded to storm the jobsite and destroy virtually all property on the site. The destruction included leveling 4000 feet of cyclone fence; firebombing of an office building, a guard hut, and a construction trailer; destruction of a number of pieces of heavy construction equipment; overturning other vehicles, and preventing fire trucks from extinguishing the blazes started by the mob. Damage to Altemose equipment and property exceeded $300,000.00. [Govt.Exh. 7].

15. Traitz and more than 100 others who he led were arrested on June 6, 1972 for refusal to comply with a state court injunction prohibiting picketing at the site. [Govt.Exh. 7].

16. A number of Roofers Union members were arrested and charged with crimes by the Commonwealth of Pennsylvania in connection with the June 5, 1972 Altemose attack. Eleven members of the Union were convicted of various crimes and served prison terms. The Roofers Union used Union funds to pay for the legal criminal defense of the eleven members charged, and has made six annual payments to them during their term of incarceration and since their release from prison. The Union has also paid for and had installed at the Union Hall a plaque listing each of the eleven convicted roofers honoring them for their role in the Altemose matter. [N.T. 1256–1261].

*Kitson Brothers, Inc.*

17. Kitson Brothers, Inc. ("Kitson Bros.") is a non-Union commercial roofing contractor that has resisted the Roofers Union since 1972.

18. In early 1972, Union officials Traitz, Jack Kinkade, Carlton Brown ("Brown") and others tried to organize the Kitson

2. McCullough was murdered on December 16, 1980. Stearn was the president of the Union.

Bros. workers, sponsoring a dinner for them at the Waterfall Lounge. There were approximately twenty (20) workers from Kitson Bros. and six or seven business representatives of Local 30 present. A vote as to whether a representation election should be held by the National Labor Relations Board ("NLRB") was held. The ballot box was in the room with Brown, who was visibly armed with a handgun. The Roofers Union received enough votes that evening to have an election, but it later lost the representation election. [N.T. 526–529].

19. Thereafter, on May 7, 1972, seven of Kitson Bros.' trucks were firebombed. Later that month, members of the Roofers Union beat two Kitson Bros. employees. [Govt.Exh. 7].

20. From 1972 to 1979, Kitson Bros. endured threats, violence and vandalism on at least eight jobsites from a variety of Roofers Union agents and members, including Traitz (three times), Joseph Enright ("Enright"), Jack Kinkade, Brown, McCullough, Mangini (three times) and Michael Daly (two times). Union representatives threatened Kitson Bros. employees with death, attacked them with rocks, firecrackers, and clubs, and destroyed their vehicles and work. The Kitson Bros. business office building was defaced when it was sprayed in 1977 with an asphalt roofing material in a pattern that read "30–30–30," [Govt.Exh. 10F], a practice of vandalism repeated on a job Kitson Bros. was working at the time, and again two years later in 1979 on Kitson Bros. jobsites in Mount Laurel, New Jersey and northeast Philadelphia. Although the persons responsible for the vandalism have not been apprehended, the court finds from the weight of the evidence that some or all of the then leaders of the Roofers Union or their designees were responsible for this criminal conduct. [N.T. 529–577].

21. From 1979 to 1982, the Roofers Union caused Kitson Bros. substantial vandalism on three additional jobsites. The damage occurred at night when the jobsites were vacant, and as a result no Union officials have been identified as responsible; however, the court finds that these incidents fit a deliberate pattern and policy of prior and subsequent vandalism, and that the Roofers Union was responsible. [N.T. 529–577].

22. On May 9, 1985, defendant business agents Traitz, III and Schoenberger assaulted Kitson Bros. employee Peter Snow ("Snow") and damaged his truck on a jobsite, on the ground that Snow was a non-Union roofer who rebuffed their organizing pitch. When Snow filed assault charges in state court, he received threatening phone calls from members of the Roofers Union. At the preliminary hearing, Joseph Traitz, Traitz, Traitz III and Schoenberger appeared and tried to intimidate Snow by staring him down and bumping him on the shoulder whenever they walked by. Kitson Bros. filed unfair labor practice charges with the NLRB on behalf of Snow, resulting in a $50,000.00 contempt of court fine against the Roofers Union. [N.T. 577–588, 1255–1256].

23. The effect of the Roofers Union's campaign of violence, terrorism and vandalism on Kitson Bros. has been to terrorize Kitson Bros.' employees and to increase Kitson Bros.' costs by making retention of employees difficult and by making jobsite security expensive. [N.T. 555–556].

*Kaller Roofing Company*

24. Richard A. Kaller, a non-Union contractor, runs three roofing companies: R. Kaller and Sons, J.A. Miller and H.L. Smith. The three companies employ about 50 people and operate out of the Philadelphia suburbs. Approximately 60% of their work is residential and 40% is commercial. [N.T. 140].

25. Richard Kaller attended the 1968 or 1969 Rifle Club meeting where Traitz explained the plan for organizing residential roofers. [N.T. 141–143]. In the early 1970's and the ensuing ten years, Traitz had several conversations with Richard Kaller, with the intent of threatening Richard Kaller in order to get him to have his companies join the Union or to get out of the roofing business. Through these conversations Traitz made the threat: "You'll

find yourself in the hospital if you are not careful." [N.T. 146–147].

26. On a morning in or about 1976 Richard Kaller was on a shingle roofing job at Seamen's Church in Center City, Philadelphia. Two cars of men, including Enright, identifying themselves as Union officials of Local 30, arrived at the jobsite. Enright threatened Tom Kirby, the job foreman, with injury for refusing to join the Roofers Union. [N.T. 148–156].

27. In or about 1978 at McGowan Ford, a jobsite in West Chester, Pennsylvania, Richard Kaller's crew was threatened by three men who drove to the jobsite in a truck with a Local 30B sticker on it.[3] The driver of the truck threatened, "You scabs better get out of here. If your equipment is here tonight, it will be wrecked. If we see you on the job, we'll beat you up." [N.T. 159–161].

28. In late 1979, Richard Kaller began a large commercial roofing job at Sutton Terrace, a condominium complex in Bala Cynwyd, Pennsylvania. The Roofers Union undertook a campaign of terror and intimidation to force Richard Kaller to withdraw from the job unless he signed a Roofers Union contract. Richard Kaller's subcontractor, Jack Spears ("Spears"), even though he was a Local 30B signatory, was unable to complete his job for Richard Kaller at Sutton Terrace due to pressure from Traitz. [N.T. 164–167].

29. Richard Kaller phoned Traitz to discuss why Spears was thrown off the job. Traitz told him that he wanted Richard Kaller out of the roofing business and Richard Kaller should talk to Francis "Franny" McCullough, the Roofers Union business agent for the area. [N.T. 168].

30. Shortly thereafter, Francis McCullough, Jack Kinkade, Joseph Kinkade, Traitz and others in a group of ten arrived unannounced early in the morning at the Sutton Terrace jobsite while Richard Kaller was there to supervise the lifting of a tar kettle to the roof. [N.T. 170–171]. The kettle was being lifted to the roof to pro-

tect the kettleman from Union violence because he would otherwise be left on the ground while the rest of the crew was up on the roof. When the kettle was being lifted Francis McCullough said in the presence of his nine Union confederates that he was going to beat up Richard Kaller and put him in the hospital. In addition, a group of Union men had a brief discussion in front of Richard Kaller about who should beat him up. [N.T. 171–173].

31. A few days thereafter, Richard Kaller met with Union representative Jack Kinkade in the Sutton Terrace parking lot. Jack Kinkade had a handgun laying on the seat between him and Richard Kaller. Jack Kinkade, in an effort to intimidate and threaten Richard Kaller, told him that the situation did not have to turn into gunplay. Richard Kaller left that meeting thinking that he was going to quit the roofing business and believed he was on his way to the hospital. [N.T. 177–178].

32. After several more weeks of similar threats on the jobsite, Richard Kaller, at the urging of the condominium developer, went with the developer's representative to a meeting at the Union Hall. At that meeting Richard Kaller agreed to put four of his employees into Local 30 and to accept Local 30 men on the Sutton Terrace jobsite. [N.T. 179–185]. After these people began work for Kaller, the roofers supplied by the Union sabotaged and further disrupted the job and Kaller's equipment, and continued to threaten Kaller with physical harm for perceived infractions of the Union rules. [N.T. 185–190]. In this atmosphere the job ended in early 1980. [N.T. 195].

33. Curtis Kaller, the brother of Richard Kaller, operates C. Kaller, Inc., a small non-Union roofing company. In June or July of 1985, Roofers Union business agents Osborn and Schoenberger approached him when he bid on a large commercial roofing job at Trinity Church in Ambler, Pennsylvania. Osborn and Schoenberger asked him to meet them at the Union Hall. Since Curtis Kaller feared

---

**3.** One of the Union's methods of making sure it could distinguish friend from foe in the group of employers it dealt with was to issue a large "Local 30–30B" Union logo sticker to be prominently affixed to the friendly employers' trucks.

that he would be beaten if the meeting was held at the Union Hall, he refused to go there and Osborn and Schoenberger met Curtis Kaller at the Horsham diner. In an effort to induce Curtis Kaller to sign the Local 30B agreement, Osborn told him that the Roofers Union would ignore the wage rates he paid his men as long as he paid dues and benefit payments regularly. Osborn told him, "Well, if you don't get involved with the Union, if you don't get in the Union, you could get hurt and you could have accidents." Despite this inducement, Curtis Kaller did not sign the Local 30B agreement. [N.T. 234–240].

34. Shortly thereafter, in the beginning of 1986, when Curtis Kaller was nearing completion of this same Trinity Church job, the windows of his four roofing vehicles in the parking lot of his shop were shattered. The vandals were not caught. No other vehicles present were smashed and Curtis Kaller knew of no one else who would do such vandalism to him. [N.T. 240–241]. These circumstances easily lead the court to the conclusion that the Roofers Union, through its agents, was responsible.

*I. Alper Company*

35. I. Alper Company ("Alper"), is a non-Union roofing company located in Camden, New Jersey. The Alper family and Alper employees have been victims of Roofers Union violence and destruction since the 1960's, all in an effort to force the company to sign a Union agreement and become a Union contractor. For about 20 years between 1960–1980 on many occasions, Union business agents destroyed roofs where Alper was working, and instructed Union members to slash tires on Alper's vehicles. [Govt.Exh. 16–T–5].

36. In May 1985, Union business agents Joseph Kinkade and McBride offered to end Roofers Union-sponsored vehicle and jobsite vandalism, as well as any troubles Alper might have with other labor unions, if William and Hyman Alper, the company owners, would sign a Local 30 collective bargaining agreement. The Alpers declined. [Govt.Exh. 16–T–5].

37. Steven Alper was job foreman at a roofing job on a pharmacy in Margate, New Jersey on May 15, 1980. He was approached on that jobsite by Roofers Union business agent Daly and another man. Daly told him to stop the job or "there is going to be an awful lot of trouble ..." [N.T. 112–115].

38. The next day, May 16, 1980, Steven Alper was foreman on the roof on a job at Crane Plumbing in Atlantic City, New Jersey. Daly and five other men stole an Alper dump truck and burned it. [N.T. 115–120].

39. Craig Alper, Steven Alper's cousin, has been with I. Alper Company for 16 years. Craig Alper was at a roofing job in late summer of 1971 at the Pennsauken Industrial Center when three Local 30 men with bats walked up and said: "This is a union job, and you are a nonunion contractor. You can't be working here. Get the fuck out of here or we'll beat the shit out of you." [N.T. 1172–1174].

40. Other instances of harassment and/or physical damage by the Roofers Union against the Alper companies include occurrences at the following jobsites: Hancock School in Lansdale, Pennsylvania (Summer 1981—business agent Brown); AMTRAK 30th Street Station (Summer 1982—$200,000.00 damage); Greenberg School in Northeast Philadelphia (Summer 1983); Martin Luther King High School (Summer 1983—$80,000.00 damage); Martin Luther King High School (Summer 1984 —ladder pulled away from roof and truck firebombed). [N.T. 1175–1197].

41. In 1985, on the Fels Junior High School ("Fels") job by Alper, Traitz was the impetus behind the Occupational Safety and Health Administration ("OSHA") conducting an unwarranted safety inspection. [N.T. 120–122]. Both Traitz and his accomplice, OSHA Area Director Bernard Dillon, have been convicted of bribery and corruption for actions that occurred shortly after the inspection of the Fels job, and the court concludes in this civil case that the corrupt relationship extended to the unwarranted 1985 Fels inspection by OSHA as well. [Govt.Exh. 4B, 4C].

*Steven Kurtz Roofing, Inc.*

42. Steven Kurtz ("Kurtz"), another victim of Roofers Union violence, began business as a roofing contractor in 1970. Two or three years later in 1972 or 1973 he voluntarily approached the Roofers Union to discuss unionizing his company, which then consisted of about three employees. [N.T. 456]. After those discussions, he decided not to do so. Shortly after Kurtz's visit to the Union Hall, business agents Brown and Williams came to his house, and during a brief discussion there, threatened that they might burn the house down. [N.T. 457]. Kurtz had no significant involvement with the Union from 1973 to the spring of 1983. In 1983, Union agents or members vandalized a roof Kurtz was installing and stole two tar kettles owned by Kurtz's company. After each incident, Kurtz received a late night anonymous threatening phone call about the roofing equipment damage and thefts. [N.T. 459–462].

43. By this time, the Kurtz business had expanded to about twenty employees, and performed an occasional commercial roofing job. In early 1983, the Kurtz company was removed from a commercial roofing job in Manayunk, Pennsylvania, that was one-half completed because the owner of the building wanted to finish the job with a Union company. [N.T. 463–464].

44. Soon after this removal, Union business agents Joseph Kinkade and McBride visited Kurtz's office in Chestnut Hill, Pennsylvania, to attempt to Union organize his company. Traitz and Medina arrived at Kurtz's office shortly thereafter. Kurtz told these four Union agents that he was willing to join the Union if the men wanted to join the Union. He arranged for business agents to meet privately with his employees to discuss joining the Union. After meeting with Kurtz's employees, business agent Joseph Kinkade told Kurtz that the Union had been unable to generate sufficient support among the employees to win a representation election. He asked Kurtz to sign a collective bargaining agreement notwithstanding the opposition of his employees. Kurtz refused. [N.T. 464–467].

45. Kurtz then experienced a period of almost two years during which his contacts with the Union were minimal. His workforce grew to about 30 men. This period of tranquility was broken on May 8, 1985 when two unidentified men attacked Kurtz as he got out of his jeep at his shop at about 6:30 a.m. The men beat and kicked Kurtz in the head and ribs repeatedly, severely bruising his face and cracking three ribs. [Govt.Exh. 14]. During the attack, Kurtz asked his attackers "why," to which one of them responded: "Because you won't join the union." [N.T. 467–470].

46. The following night, May 9, 1985, at approximately 10:00 or 11:00 P.M., a telephone caller identifying himself only as "Billy" said: "Steven, I just want you to know that this is only the beginning." He also called Kurtz a "scab." Kurtz signed an agreement with the Roofers Union during the summer of 1985. [N.T. 473–474].

*D & D Roofing, Inc.*

47. Douglas Dardaris ("Dardaris"), a roofing contractor doing business as D & D Roofing, signed a Local 30B agreement in 1979 after Traitz, Joseph Traitz and several other Roofers Union agents and members assaulted him in front of his employees on a jobsite, breaking several ribs. The Union had earlier defaced a Roy Rogers building for which Dardaris had done roofing work by pouring liquid asphalt roofing material on the building. He was required to post a $500.00 cash "bond" to "join" the Union, which has not been returned. When the individual defendants were indicted, Dardaris withdrew from the Union. During the seven years of their membership, his employees never received any Roofers Union cards. [N.T. 622–647].

*Small Roofing Contractors*

48. The campaign of violence, fear and terrorism sponsored and carried out by the Roofers Union leadership to coerce companies into dealing with the Union impacted upon many very small contractors as well as the larger employers discussed above.

49. Alex Kolosenko ("Kolosenko") has been a roofing contractor in Philadelphia since about 1973, usually working alone.

In 1982, he was performing subcontract work for Local 30B contractor Fred Wallace ("Wallace"), a man who has held various positions within the Local 30B employers association. He quit working for Wallace in early September when Wallace refused to pay him more money. Between 7:00 and 8:00 A.M. on September 17, 1982, while parking his truck at a jobsite on Red Rambler Drive in northeast Philadelphia, Kolosenko was physically assaulted and cursed at by three members of the Roofers Union, including Osborn and at least two others whose surnames were Devenney and McCullough. The three punched and kicked Kolosenko, threw him to the street, and left him semi-conscious next to his truck as they drove away. The court finds that the purpose of the assault was to coerce Kolosenko into signing a Union contract. Several days later, Kolosenko went to the Union Hall and signed the Local 30B collective bargaining agreement. [N.T. 18–24, Tape 11].

50. In October 1985, out of fear that he would be beaten again, Kolosenko acquiesced to the demands of Roofers Union business agents Medina and Schoenberger that he pay to the Union "dues" payments equivalent to 100 hours per month ($60.00) regardless of whether he worked those hours ("the 100–hour policy"). [N.T. 27–29].

51. In the summer of 1987, after Kolosenko quit the Union, persons believed to be Local 30/30B agents, together with a Bruce Reas ("Reas"), threatened him with physical harm in front of his daughter while he was working on the rooftop of a job as a non-Union contractor in his own neighborhood. Kolosenko was asked by a man wearing a Roofers Union jacket and hat if he was a Union member. He answered "no." The man left and returned with Reas and a third man. Reas asked the third man to bring him a hatchet. Reas attempted to climb the ladder, hatchet in hand, but Kolosenko kept shaking it. Around the same time, the Roofers Union also sabotaged his truck by cutting tires 21 times and removing the nuts from the bolts that hold the front spring together. [N.T. 27–35].

52. Ronald Wanner was a summer employee of his father's roofing business in August, 1975 when Roofers Union business agent Daly and another large man threatened him and beat him up because he was doing a small commercial job without being a Union member. The assault left Ronald Wanner with various injuries, including a cracked nose and a black eye. [N.T. 397–405, 407–408]. In 1974 and 1975 Daly threatened John Wanner, Ronald's father, with trouble and damage. [N.T. 413–419]. Daly said: "Well, you better become union or something could happen to your truck. It would be a shame if something happened to your truck." [N.T. 414]. At a job for Rittenhouse Freight Company, he told John Wanner: "You better just clear out of hear [sic] and leave these jobs alone, because you are going to get into trouble." [N.T. 415]. After the attack on his son, John Wanner began to carry a gun on the job. Eventually he virtually withdrew from roofing work because of fear of the Union. [N.T. 420].

53. William Unangst ("Unangst") was a temporary non-Union employee of Mynar Roofing on December 28, 1982, when he was viciously assaulted outside a bar at night by Traitz III, Joseph Traitz, Schoenberger, Robert Hammond ("Hammond") and fellow Mynar employee David Nestor. Hammond, a member of the Union, was a close friend of the Traitz family who frequently participated in assaults on behalf of the Roofers Union. During the December 28th attack, the assailants tore Unangst's ear half off, cut his face, punctured his eardrum and injured his ribs. They also assaulted and knocked unconscious Joe Salvino ("Salvino"), a friend of Unangst who tried to help him. The attack occurred because Unangst was not a member of the Roofers Union. [N.T. 421–432; Govt.Exh. 11C].

54. Within a week after Unangst and Salvino filed criminal charges in state court against those members of the Union, Traitz called them to a meeting at the Montgomery County Boys Club, where Traitz was involved as a boxing trainer. Present were Traitz, Unangst and Salvino, the co-owners

of Mynar, and McBride. The atmosphere was threatening and intimidating to Unangst and Salvino. Traitz threatened Unangst and Salvino. He threatened that Unangst's friends would be out of work, and intimidated the two into dropping the criminal charges. After the incident, Mynar gave Unangst less and less work, and eventually Unangst quit. His fear of the Union continues to the present. [N.T. 432–439].

55. Hans Martin Glang ("Glang") is a German immigrant who came to the United States in 1982, and began operating as a small non-Union roofing company in the Philadelphia area in 1983. During the fall of 1984 two Roofers Union business agents, one of whom visibly carried a gun, visited Glang on a jobsite at the Abington Pharmacy, leaving a business card to call Traitz. They urged him to join the Union. In a later telephone conversation Traitz also urged Glang to join the Union. Glang refused, and took steps to avoid the Union by moving his location and changing his phone number. [N.T. 886–892, 902].

56. During this period, Glang also held a part-time job as a doorman at an American Legion Post in Willow Grove, Pennsylvania. On the night of January 5, 1985, Traitz, Schoenberger, and at least eight other Roofers Union agents and members approached the door of the bar/club and asked for Glang. He appeared at the door and went outside to meet with the group of roofers. Without provocation, Traitz pulled Glang by the hair and knocked him down. A brawl ensued between the eight or so Roofers Union members and a group of doormen who came to Glang's aid. Glang's hand was broken in the fight, which lasted about thirty minutes before police intervened. After this assault, Glang gave up his roofing business. [N.T. 893–899, 908, 912, 917].

## C. *Sabotage And Vandalism Against Non–Union Contractors*

57. In addition to resorting to face-to-face violence against persons and property, the Roofers Union program, to achieve its goals and demands, has also included clandestine vandalism and sabotage often coupled with threats of violence.

58. In the case of non-Union roofer George Geyer ("Geyer"), for example, the Roofers Union relied exclusively on sabotage of Geyer's vehicles, extensive vandalism to a roof, theft of equipment, and a threat that "There is no way you are going to do that job as a non-union contractor" from business agent Joseph Kinkade. After several such experiences, Geyer agreed to sign a collective bargaining agreement in the summer of 1985. [N.T. 774–776, 788–794].

59. James L. Miller ("Miller") of Schuylkill Haven, Pennsylvania, a non-Union contractor, bid on a school job near Reading, Berks County, Pennsylvania, in June of 1985. The day after Miller won the bid, Union business agent Phillip Cimini ("Cimini") called him and made an appointment for a meeting regarding the job. Shortly thereafter, Cimini visited Miller's shop and tried to secure his consent to sign a Roofers Union agreement. At the end of a half-hour discussion that had been amicable in tone, Cimini told Miller: "Either you join or we'll get you." [N.T. 736–743].

60. About halfway through the school job that had precipitated Cimini's organizing efforts, the jobsite was vandalized; holes had been torn in the roof; and Miller's equipment had been damaged. This background, coupled with the fact that roofers' tools were required to tear such holes in the roof and Miller left no such tools at the jobsite, causes the court to draw the reasonable inference that the Union was responsible for this vandalism. The total damage exceeded $80,000.00, and the insurance claim eventually caused Miller to lose insurance coverage for his business. As a result, Miller stopped doing business in the territory covered by the Roofers Union. [N.T. 744–751].

61. Roof–Vac, Inc. ("Roof–Vac"), a specialty company from Baltimore, Maryland, operates a roof washing and vacuuming business and uses a machine called an "aqua-vac," which is used to clean dirt and gravel from roofs in preparation for reroofing. J.J. Urethane Company ("J.J. Ur-

ethane"), a Local 30 contractor, hired Roof–Vac in the summer of 1984 to remove the gravel and clean the roof of a school in Boyertown, Pennsylvania, where J.J. Urethane was the prime roofing contractor. During the job, various agents and members of the Union came to the jobsite on a Saturday night and destroyed the aqua-vac and other Roof–Vac equipment on the jobsite. Traitz admitted responsibility for the destruction in a conversation with John Di-Nenna ("DiNenna"), owner of J.J. Urethane, several days later, and blamed the damage on the fact that Roof–Vac was a "scab rock-sucker," meaning a non-Union vacuuming company. [N.T. 722–727].

62. In the summer of 1986, J.J. Urethane again hired Roof–Vac as a subcontractor, this time on a job on Delaware Avenue in Philadelphia, Pennsylvania. Roofers Union business agent Williams demanded that for the duration of the job Roof–Vac employees join the Union and that the dues be paid by J.J. Urethane. [N.T. 727–728].

### D. *Economic Pressures On Non–Union Companies*

63. The Roofers Union on many occasions has attempted to make doing business unnecessarily more difficult and expensive for non-Union roofing companies. Preventing equipment dealers from renting to or servicing non-Union companies was one of the means of doing this. Edward Alston ("Alston"), a roofing equipment supplier located in New Jersey, has been so intimidated and coerced by the Union business agents that he has an informal policy of not dealing with non-Union roofing contractors for fear of equipment damage or personal injury. One of the non-Union contractors to whom Alston has refused to rent equipment is the Sensenig Roofing Company of Ephrata, Pennsylvania. [N.T. 499–517, Govt.Exh. 16–T–3].

64. The Roofers Union leadership also attempted to eliminate any low bidding advantage experienced by non-Union contractors by making non-Union work expensive. For example, this has occurred by the Union's sabotage and vandalism of non-Union

jobsites as previously stated, which often caused non-Union employers to incur the additional cost of security necessary to protect property, equipment and supplies which raised their cost of doing business.

65. In order to prevent vandalism from members of the Union, the Alper Company has been forced to place 24–hour security guards on any jobs it performs in the City of Philadelphia in order to prevent vandalism. [N.T. 1185–1186]. The Miller company, after experiencing the $80,000.00 damages from vandalism as described in finding of fact 60 above, placed guards with dogs on the jobsite throughout the repair and completion of the job. [N.T. 750]. The Geyer company suffered damage to the roof it was working on as well as $750,-000.00 damage to property of Freelance, Inc., the owner of the jobsite building vandalized in 1984. [N.T. 775; Finding of Fact 58]. Richard Kaller testified to substantial sabotage by Roofers Union workers during the Sutton Terrace job in 1979–80. [N.T. 185–191; Finding of Fact 32].

66. The plain meaning of the taped conversation between the Alper brothers in 1985 and Roofers Union business agents Joseph Kinkade and McBride was that the Union-caused inconvenience and extra costs to the Alper Company would disappear once the company signed a Roofers Union agreement. [Govt.Exh. 16–T–5].

### E. *Violence To Dominate And Control Union Contractors*

67. Over the past twenty years, the Roofers Union leadership has used, as its primary tactic, threats and violence in lieu of lawful and more conventional means for resolving disputes with Union-signatory contractors.

*Robert Kryszczak*

68. Robert Kryszczak ("Kryszczak") is the chief estimator and corporate secretary for Kulzer Roofing, Inc. ("Kulzer"), a large Union roofing contractor in Philadelphia, Pennsylvania. In February 1985, Kryszczak became involved in pricing and setting up roofing repair work on a building in Bensalem, Pennsylvania, owned by Leaseway Corporation ("Leaseway"). Due

to the necessity for prompt repair, Leaseway awarded the job to Kulzer on a "time and materials" basis. [N.T. 69–73].

69. When Local 30 Union shop steward Michael Sullivan ("Sullivan") learned that the job was awarded on a "time and materials" basis, he demanded that Kryszczak "load" the job with unnecessary roofers from Local 30. Kryszczak refused to do so. At a meeting on the roof of the building,[4] six Local 30 representatives viciously punched and kicked Kryszczak into semi-consciousness. His assailants included Roofers Union business agents Joseph Kinkade, Joseph Traitz, Traitz III and Schoenberger, shop steward Sullivan and another unidentified male. Kryszczak suffered a permanently dislocated jaw, permanent neurological damage, dental damage, bruises and abrasions, and psychological damage. [N.T. 77–88].

70. After the beating, Kulzer threatened to fire Kryszczak if he carried through his announced intention of suing the Union for the assault. [N.T. 88].

71. Despite this, Kryszczak did sue the Union as well as the six individuals who attacked him. [Govt.Exh. 6A]. Settlement of the case will cost the Union treasury approximately $1 million, including damages to Kryszczak and the legal cost of defending the case. [N.T. 1251–1255; Govt.Exh. 39].

*Michael Kobithen, III*

72. Michael Kobithen, III ("Kobithen") signed his roofing company up with the Roofers Union in 1978, shortly after he went into business as a roofing contractor, to avoid trouble with Local 30/30B. In 1981, Roofers Union official Joseph Kinkade called Kobithen into the Union Hall, accused him of cheating on his hours and insisted that he employ a Roofers Union shop steward. [N.T. 258–260].

73. In 1983, Kobithen began having problems with employees about overtime hours, and installed a time clock as a corrective measure. In November 1983, Union officials McBride, Medina and two other men came to his office. They assaulted him in front of his employees, using their fists, a large iron monkey wrench and an ax, causing broken bones in his face, a punctured eardrum, and badly bruised ribs. Medina also threatened one of Kobithen's employees who tried to aid Kobithen during the beating. The Union representatives also wrecked Kobithen's office. Only later did he learn that the time clock caused the beating. He did not report the attack to any tribunals out of fear of the Roofers Union. [N.T. 260–271].

74. In 1985, Local 30/30B required Kobithen to pay Union dues for 100 hours per month regardless of whether he worked those hours, and his Union shop steward forced him to buy unwanted tickets to political fund raisers and benefits on several occasions. [N.T. 271–274].

*Thomas Hudecheck*

75. Thomas Hudecheck owns a roofing company in Downingtown, Pennsylvania. Hudecheck attended the Rifle Club meeting in 1968, signed a collective bargaining agreement in 1969 with Local 30B and has been a Local 30B contractor continuously since then, even though most of his work was commercial and would probably be governed by a Local 30 agreement. [N.T. 296–297].

76. In the summer of 1983, Roofers Union business agent Daly contacted Hudecheck on three separate occasions to complain that Hudecheck had bid successfully on commercial jobs that Daly did not want him to have because he was operating under a 30B residential agreement. Daly insisted that Hudecheck back out of the jobs. When Hudecheck refused, Daly then demanded that Hudecheck subcontract the jobs to Michael Gravely, a commercial roofing contractor affiliated with Local 30. Hudecheck complied with this. [N.T. 299–303].

77. On August 23, 1983, the Hudecheck office in Downingtown was firebombed,

---

4. The testimony made it clear that on many occasions the Union insisted that confrontations between Union representatives and employer representatives take place on the roof of the buildings being worked on. In many instances the meetings on the roof were intended by the Union to be dominated by fear of physical force and personal injury.

causing considerable damage. At about 7:45 A.M. on that date, as the fire company arrived to extinguish the fire, defendant Daly also arrived. Daly said to Hudecheck: "It looks like you have a problem here, and things like this happen when you piss people off." Given the history of the dealings between Daly and Hudecheck, Daly's appearance at the fire scene, and his statement to Hudecheck, the court finds that defendant Daly, and thus the Union, was responsible for the firebombing of Hudecheck's office. [N.T. 303–304].

78. On July 29, 1985, Daly, Traitz III, and another individual came to Hudecheck's office, and in the presence of Hudecheck's attorney, Steven Mascherino, assaulted Hudecheck, punching him to the ground and kicking him. Based on what Daly said to Hudecheck during the attack, the reason they assaulted Hudecheck was because Daly *thought* Hudecheck had used a non-Union employee. [N.T. 306–310, 329–332].

*Thomas Zimmerman*

79. Thomas Zimmerman ("Zimmerman") has been a residential roofing contractor since 1969. He joined Local 30B as an employer when he started the business so that his employees could enjoy better benefits. For about 18 months to 2 years in the early 1980's, Zimmerman was a member of the Board of Directors of the Roofing, Metal and Heating Associates, Inc., the Local 30B employers' association. In the early summer of 1983, at a board meeting of the contractors' association, Zimmerman raised the issue of hiring a professional negotiator to bargain with the Union. About a week later, he was summoned to the Union Hall for a meeting with business agents McBride and Joseph Kinkade, who accused him of badmouthing the Union. Zimmerman later clearly understood this meeting to be a warning to him not to speak out at meetings of the contractors' association contrary to Union interests. [N.T. 352–355].

80. In late October or early November, 1983, shortly before the collective bargaining agreement with the Union was up for renewal, Zimmerman spoke out at a contractors' association board meeting against a Roofers Union proposal for a contract clause whereby each employee would pay 3 or 4 cents per hour by check-off to a political action committee. Zimmerman convinced the board to turn down that Roofers Union proposal. [N.T. 355–358]. Within a week or two of that board meeting, and because of Zimmerman's position on the contractual issue, Roofers Union officials Joseph Kinkade and McBride visited Zimmerman's shop. Joseph Kinkade told the contractor in front of his three employees that he had "a big mouth" and was finished as a Union contractor. Joseph Kinkade removed the employees from Zimmerman's company, and told them that if they came back to work for Zimmerman they would be non-Union and would be beaten up. [N.T. 358–361]. Kinkade also punched Zimmerman. [N.T. 362]. After Kinkade and McBride left, Zimmerman contacted the contractors' association for help. The only help or support the association would provide was to suggest that he go *alone* to the Union Hall and meet with Union officials. [N.T. 362–363].

81. Within a week, Zimmerman met with Roofers Union officials Jack Kinkade, Joseph Kinkade, McBride, Medina, Schoenberger, Hurst and others at the Union Hall. Zimmerman went to the Union Hall meeting alone and was surrounded by six to nine leaders and members of the Union. Jack Kinkade was the principal spokesperson for the Union. Zimmerman was told at this meeting that he was shut down for his big mouth, and that in order to get back in business, he would have to (a) resign from the Board of Directors of the contractors' association, (b) buy $750.00 worth of tickets to a charitable benefit, and (c) accept in place of his own long-term employees workers the Union would select and send him from the Union Hall. During the meeting, Medina threatened that he would break Zimmerman's arms, and Hurst threatened him that if he spoke against the Union's proposals again, "we'll put you in the fucking hospital." [N.T. 364–370].

*Harry Rohlfing*

82. Harry Rohlfing ("Rohlfing") is a roofing contractor who, with his brother,

began a roofing business in 1981. Rohlfing promptly signed a Local 30B collective bargaining agreement because he thought, based upon his perception of the Union's violence, it would be impossible to operate a roofing business safely in the City of Philadelphia without having the Local 30B decal stickers on his vehicles. [N.T. 380].

83. In late July or early August 1984, the Rohlfing company hired for a day's work a 23 year old man who was not a member of the Roofers Union. The employee was injured on the job, requiring hospitalization. Within two weeks of the injury, Medina called Rohlfing to the Union Hall. Inside the Union Hall meeting room, Medina and eight or nine other Roofers Union officials and/or members surrounded Rohlfing, cursing and shouting at him about the non-Union employee. One of the men struck Rohlfing repeatedly on the face. Members of the group threatened to put him in the hospital if he resisted or defended himself. [N.T. 481–488].

84. Rohlfing was so intimidated from that meeting that he closed up his business several months later and moved to Florida. [N.T. 488].

### Keystone Roofing: Fred Laincz

85. Fred Laincz ("Laincz"), was a superintendant and not a Union member for Union contractor Keystone Roofing located in Pennsauken, New Jersey. He found it necessary to do some roofing work personally on a supermarket in Newtown Square, Pennsylvania, during the summer of 1978 because Union roofers had left the job unprotected during a rainstorm. In response, McBride, then a steward and since named a business agent by the Union, accused Laincz of doing roofer's work (meaning work reserved by the agreement for Union members). Laincz denied any wrongdoing. McBride's response was to beat Laincz repeatedly when Laincz arrived at later time at the Keystone offices. McBride told Laincz: "Don't ever lie to me again, motherfucker, because a lot worse is going to happen the next time." [N.T. 671–676].

86. In or about the summer of 1978, superintendent Laincz visited a jobsite to deliver paychecks. The crew on the jobsite in question had been hired through the Roofers Union Hiring Hall and Laincz had been having trouble with them. Laincz parked his car next to the worker who operated the kettle containing hot asphalt. When Laincz left the site he drove approximately two miles down the road when his car began to make a slamming noise and it stopped. When the engine was removed and examined, asphalt was found inside. [N.T. 681–684]. The court draws the only reasonable and compelling inference that the Union kettleman and maybe other members of that Union-sent crew vandalized Laincz's car by putting roofing asphalt into the oil-fill part of the engine.

### William Szili

87. William Szili ("Szili") is a suburban roofing contractor who signed a Local 30B contract in December 1982. [N.T. 599]. When Szili signed the agreement, business agent Medina orally announced additional contract requirements for Szili's business that did not appear in the written contract. [N.T. 601–602]. In March 1985, Szili was working on a large commercial job in Norristown, Pennsylvania, when Medina called him and told him to come to the Union Hall for a meeting. Szili complied. Medina then led Szili into the business agents meeting room, where he was surrounded by six to eight Union members and officials. Medina screamed at Szili that he was underreporting his hours worked. Medina struck Szili, knocking him to the floor, and told him he was out of the Roofers Union. [N.T. 604–610].

88. Several weeks later, Traitz III and Joseph Traitz met with Szili and he signed a new Local 30B agreement. During this meeting, Traitz III told Szili that if Szili would notify the Union of activities of non-Union contractors, they'll be taken care of. [N.T. 611].

### F. Criminal Offenses For Which The Individual Defendants Were Convicted

89. In September 1985, the Federal Bureau of Investigation ("FBI") obtained a federal court order under Title III, 18 U.S. C. § 2510, et seq., permitting placement of

electronic surveillance devices inside the Roofers Union business offices at 6447 Torresdale Avenue, Philadelphia. The electronic surveillance under this court Order continued from September 26, 1985 to approximately February 20, 1986.

90. By superseding indictment filed in this district in October 1986, the government charged thirteen officials of the Roofers Union with violations of RICO, 18 U.S.C. §§ 1961-1968, RICO conspiracy, and with numerous predicate criminal acts. The thirteen indicted officials in that criminal case are the same individual defendants named in this civil case.[5] [Govt.Exh. 1].

91. By jury verdict of November 23, 1987, all of the defendants were found guilty of a combination of 152 counts of racketeering, RICO conspiracy, and predicate criminal acts, as follows:

(a) Traitz, business manager, was found guilty of one count of substantive RICO, RICO conspiracy, eight counts of mail fraud, three counts of solicitation of kickbacks and gifts to influence the operations of an employee benefit plan, three counts of embezzlement from an employee benefit plan, four counts of bribery of a public official, two counts of collecting credit and claims by extortionate means, and two counts of interstate travel in aid of a racketeering enterprise.

(b) Hurst, president, was found guilty of one count of substantive RICO, RICO conspiracy, three counts of solicitation of kickbacks and gifts to influence the operations of an employee benefit plan, and three counts of embezzlement from an employee benefit plan.

(c) Mangini, business agent, was found guilty of one count of substantive RICO, RICO conspiracy, one count of solicitation of kickbacks and gifts to influence the operations of an employee benefit plan, one count of embezzlement from an employee benefit plan, one count of bribery of a public official, and one count of extortion.

(d) Crosley, business agent, was found guilty of one count of substantive RICO, RICO conspiracy, one count of solicitation

of kickbacks and gifts to influence the operations of an employee benefit plan, one count of embezzlement from an employee benefit plan, one count of bribery of a public official, eight counts of extortion, and six counts of collection of credit by extortionate means.

(e) Daly, recording secretary and business agent, was found guilty of RICO conspiracy and one count of bribery of a public official.

(f) Cannon, dispatcher and business agent, was found guilty of RICO conspiracy, one count of extortion, and one count of collection of credit by extortionate means.

(g) Osborn, organizer, was found guilty of one count of substantive RICO, RICO conspiracy, four counts of extortion, and three counts of collection of credit by extortionate means.

(h) Medina, business agent, was found guilty of one count of substantive RICO, RICO conspiracy, eight counts of mail fraud, thirteen counts of extortion, and ten counts of collection of credit by extortionate means.

(i) Williams, business agent, was found guilty of one count of substantive RICO, RICO conspiracy, three counts of extortion, and two counts of collection of credit by extortionate means.

(j) Nuzzi, organizer, was found guilty of one count of substantive RICO, RICO conspiracy, and two counts of interstate travel in aid of racketeering.

(k) Traitz III, organizer, was found guilty of one count of substantive RICO, RICO conspiracy, four counts of extortion, and three counts of collection of credit by extortionate means.

(l) Joseph Traitz, organizer, was found guilty of one count of substantive RICO, RICO conspiracy, six counts of extortion, and five counts of collection of credit by extortionate means.

(m) Schoenberger, organizer, was found guilty of one count of substantive RICO, RICO conspiracy, seven counts of extor-

---

**5.** There are five other defendants in the criminal case who remain to be tried.

tion, and six counts of collection of credit by extortionate means. [Govt. Exh. 2].

92. As a result of their convictions, the defendants have been sentenced as follows:

(a) Traitz—fifteen years imprisonment, five years probation, $50,000.00 fine, $18,-075.00 restitution, and $1,100.00 special assessment.

(b) Hurst—eight years imprisonment, five years probation, $40,000.00 fine, and $300.00 special assessment.

(c) Mangini—ten years imprisonment, five years probation, $10,000.00 fine, and $300.00 special assessment.

(d) Crosley—ten years imprisonment, five years probation, $10,000.00 fine, and $950.00 special assessment.

(e) Daly—nine years imprisonment, five years probation, $5,000.00 fine, and $100.00 special assessment.

(f) Cannon—three years imprisonment, five years probation, and $150.00 special assessment.

(g) Osborn—eight years imprisonment, five years probation, $5,000.00 fine, and $450.00 special assessment.

(h) Medina—fourteen years imprisonment, five years probation, and $1,650.00 special assessment.

(i) Williams—nine years imprisonment, five years probation, $10,000.00 fine, and $350.00 special assessment.

(j) Nuzzi—three years imprisonment, five years probation, $10,000.00 fine, and $200.00 special assessment.

(k) Traitz, III—eight years imprisonment, five years probation, $5,000.00 fine, and $450.00 special assessment.

(l) Joseph Traitz—eight years imprisonment, five years probation, and $650.00 special assessment.

(m) Schoenberger—eight years imprisonment, five years probation, and $850.00 special assessment.

93. These convictions and evidence at the criminal trial establish that the Union's officials used the Union to conduct the following criminal schemes:

(a) Union officials interfered with interstate commerce by extortion, in violation of 18 U.S.C. § 1951(b)(2), by using threats and violence to extort monthly "dues" payments from roofing contractors. Under this "100 hours" scheme, contractors were forced to pay dues of 60¢ per hour on 100 hours of work each month ($60.00), whether they worked those hours or not. Some of the contractors were called into the business agents conference room at the Union Hall and threatened, and sometimes beaten to enforce compliance with this "100 hours" program.

(b) Some contractors were threatened or beaten to coerce them to pay money to the Union or affiliated employee benefit plans described at the trial, in violation of 18 U.S.C. § 894, prohibiting the use of extortionate means to collect and attempt to collect extensions of credit and to punish debtors.

(c) Traitz was also convicted of collecting unlawful debts for the Scarfo-organized crime family which is the Philadelphia and Southern New Jersey faction of the La Cosa Nostra ("LCN") Organized Crime family, in violation of 18 U.S.C. § 894.

(d) Traitz and Medina participated in a mail fraud scheme by reporting as stolen a car which Medina had wrecked while driving under the influence of alcohol.

(e) Traitz, Mangini, Crosley and Hurst were convicted of embezzling funds from the Union's Prepaid Legal Services Fund in 1983, 1984 and 1985. These defendants exacted a kickback of 10% of all legal fees paid by the Union under its legal services plan. The money generated by this scheme was used to bribe public officials.

(f) Union officials bribed OSHA Area Inspector Bernard Dillon.

(g) Union officials bribed many Philadelphia and other judges, court officials, policemen, prison officials, an employee of the Philadelphia District Attorney's Office, and an official of the Pennsylvania Department of Labor. [Govt. Exhs. 1, 2, 3, 4].

## G. *Organized Crime*

94. The court-approved electronic surveillance established that sometime in 1981,

shortly after Roofers Union Business Manager John McCullough was murdered in an organized crime "hit," Traitz made an agreement with Nicodemo Scarfo ("Scarfo"), head of the LCN in Philadelphia and Southern New Jersey. Traitz was shown to have done favors for Scarfo such as collecting debts and resolving disputes between labor unions and LCN affiliated contractors. [Govt. Exh. 4, 4T; Tapes 52, 20, 93, 190, 225]. Evidence at the criminal trial showed that in return for supporting Traitz, Scarfo obtained influence over the organizing efforts of the Union and gave permission, in some instances, to the Roofers Union concerning targets of physical violence. The tapes demonstrate that Traitz valued very highly his association with Scarfo. [Govt. Exh. 4, 4T; Tape 52, 13–14]. Traitz personally benefited from the relationship by obtaining power from his association with Scarfo. [Govt. Exh. 3, 4, 4T; Tape 52, p. 4; Tape 27, p. 2; Crim.N. T. 1432]. Nicholas Caramandi, a/k/a "Crow," and Thomas DelGiorno stated in the criminal trial that Scarfo controlled labor unions through Traitz; if a labor problem arose, Scarfo relied on Traitz to solve it. [Govt. Exh. 3, Crim. N.T. 1360–61, 1432].

95. The beginning of this relationship was explained by Traitz to Scarfo associate Harry Joseph on October 10, 1985, in what has been referred to as the Traitz "takeover" tape. [Govt. Exh. 4; Tape 52]. On that tape recording, Traitz is heard explaining that a power struggle developed within the Roofers Union in early 1981 shortly after McCullough was murdered. Traitz, seeking control of the Union, sought Scarfo's aid in getting the opposing faction to withdraw its bid to take over the Union. Scarfo, in collaboration with former Roofers Union President Stearn, agreed to support Traitz. According to Traitz, a meeting of the two Union factions occurred in 1981 and the opposing faction withdrew its bid for power. Traitz's faction, headed nominally by Jack Kinkade, then assumed control of the Roofers Union and Traitz became indebted to Scarfo.

96. Throughout October, November and December, 1985, Traitz met with his inner circle (Mangini, Crosley and Hurst) and Scarfo associates Saul Kane, Harry Joseph and Alfonso J. Parisse when Scarfo business was discussed. [E.g., Govt. Exh. 4; Tapes 72, 73, 74].

97. The tape recordings in evidence contain discussions of a list referred to by Traitz which revealed that: (1) he had received permission from Scarfo to let business agent Daly beat up a Scarfo-affiliated contractor over a personal dispute [Govt. Exh. 4; Tape 79]; (2) Scarfo, together with other organized crime families, had been involved in at least two Union organizing efforts in which contractors had sought Scarfo's aid in resisting the Union [Govt. Exh. 4; Tapes 20, 25, 93]; and (3) Scarfo wanted Traitz to help collect two debts, one involving Roofers Union member Richard "Rip" Kinkade ("Rip Kinkade") and the other involving John Arena, a real estate developer and entrepreneur. [Govt. Exh. 4; Tapes 6, 9, 92, 106].

98. The subject of Count 42 of the superseding indictment was the extortionate collection of $15,000.00 from Rip Kinkade, the brother of retired business manager Jack Kinkade. Rip Kinkade was a member of the Union as were his brothers Robert, Jack, and Joe.

99. The subject of Count 43 was the attempted extortionate collection of a $350,000.00 drug debt allegedly owed by John Arena to Scarfo and some "Colombians."

100. Traitz was convicted of extortion on both Count 42 and Count 43. [Govt. Exh. 2].

### H. *Abuse Of Union Power And Funds*

101. The individual defendants and their allies and associates have managed the assets and used the power of the Union over the past twenty years in such a way as to benefit themselves rather than the membership of the Union.

102. Annually from 1980 through 1985, the Roofers Union made payments by check to the eleven members convicted for their criminal conduct in the Altemose riot.

The payments total $16,640.00 [Govt. Exh. 42; N.T. 1260].

103. In 1983, 1984 and 1985, the Union made payments totalling $51,050.00 in legal fees on behalf of the eleven men convicted for their criminal conduct in the Altemose rioting. [Govt. Exh. 42; N.T. 1260–1261; Findings of Fact 14–16].

104. During the time the eleven men were in prison, the Roofers Union paid or arranged to be paid to those men "full benefits and pay for their families," according to the Union minutes of June and July, 1980. [Govt. Exh. 42; N.T. 1258–1259].

105. As a result of the attack on contractor Kryszczak on February 13, 1985 by defendants Schoenberger, Joseph Traitz, and Traitz III, business agent Joseph Kinkade and shop steward Sullivan, the Union has paid the following:

(a) $276,580.00 to Kryszczak, his wife and attorney;

(b) $21,132.00 legal fees for defense of the Union;

(c) $30,548.90 legal fees for defense of the six individuals.

The settlement agreement with Kryszczak calls for additional payments of more than $650,000.00 to Kryszczak and his attorney. [Govt. Exh. 39; N.T. 1251–1254].

106. The Roofers Union paid legal fees and bail bonds out of the Union treasury for each of the defendants convicted on November 23, 1987, broken down as follows:

|  | Fee | Bond | Total |
| --- | --- | --- | --- |
| Stephen Traitz, Jr. | $255,382.29 | $ 40,000.00 | $295,382.29 |
| Edward P. Hurst | 40,442.65 | 2,500.00 | 42,942.65 |
| Michael Mangini | 29,521.75 | 15,000.00 | 44,521.95 |
| Robert Crosley | 40,216.48 | 20,000.00 | 60,216.48 |
| Michael Daly | 44,550.00 | 10,000.00 | 54,550.00 |
| Daniel Cannon | 37,090.43 | 10,000.00 | 47,090.43 |
| Mark Osborn | 49,494.82 | 10,000.00 | 59,494.82 |
| Robert Medina | 65,039.51 | 10,000.00 | 75,039.51 |
| Ernest Williams | 34,500.00 | 20,000.00 | 54,500.00 |
| James Nuzzi | 53,568.75 | 10,000.00 | 63,568.75 |
| Stephen Traitz, III | 45,368.50 | 15,000.00 | 60,368.50 |
| Joseph Traitz | 68,707.95 | 10,000.00 | 78,707.95 |
| Richard Schoenberger | 29,150.00 | 30,000.00 | 59,150.00 |
|  | $793,033.10 | $202,500.00 | $995,533.10 |

In addition, the Union treasury paid out $17,821.24 for investigative support to the criminal defense team and $26,704.00 for catered lunches during the two month criminal trial. The total of all expenditures known at present on behalf of the thirteen convicted officers and business agents in connection with the criminal case is $1,040,-058.34. [Govt. Exhs. 26–33; N.T. 1239–1245].

107. All thirteen defendants were convicted of multiple crimes on the basis of a tidal wave of indisputable evidence, that in great measure came out of the defendants' own mouths and nearly all of which must have been known by the defendants and possibly even their lawyers before the trial. The Union derived no benefit from the expenditure of more than $1 million in Union funds.

108. In July 1986, the Local 30/30B Executive Board, and subsequently the membership as a whole, fearing that the Union treasury was in danger of being depleted by legal criminal defense costs on behalf of the thirteen indicted officials, voted to fund the legal defense by increasing the hourly dues check-off deducted by Roofers Union employers from the Union members' paychecks. The membership vote on this item was purportedly by secret ballot. [Govt. Exhs. 35, 36; N.T. 1247–1250].

109. The Local 30/30B official meeting minutes reflect numerous efforts in 1986 and 1987 to protect the leadership from the consequences of the FBI criminal investiga-

tion. The executive board voted in June 1986 to pay all officers and business agents who wanted to take the Fifth Amendment and be jailed for contempt in the investigation; to give Traitz a car if he was forced to vacate his Union position; to pay his salary if jailed; and in July 1986, voted to give a fifteen percent raise to anyone indicted. In April, 1987, the members voted "for BA's to keep automobiles if trial goes against them," and to pay the criminal fees and fines and for the criminal defense lawyers. This resolution in the Union's records appears again in November 1987, along with another vote to pay Traitz's attorneys fees in the event state court criminal charges were filed. [Govt. Exhs. 34–38; N.T. 1245–1251].

110. Traitz has demonstrated his willingness to abandon and betray his own Union members when his personal ambition and personal goals interfere.

111. In September, 1982, long-time Traitz associate Donald Offner ("Offner") viciously attacked his own employee, David DeFelice ("DeFelice"), with a steel pipe, beating him on the back, and then destroyed DeFelice's automobile with a log, in the apparent belief that DeFelice had reported a contract infraction to the Union. At the time, Offner was the owner of Montgomery County Roofing, a Union contractor, and DeFelice was his employee and a member of Local 30B. Seeking redress for the attack, DeFelice called the Union Hall. He received no response. Unfortunately for DeFelice, Offner had been one of the Union "honored" eleven who were arrested in the Altemose riot in 1972, and he was also associated closely with Traitz's boxing activities in the Montgomery County Boys Club. Rather than supporting his member's position, Traitz threatened DeFelice and attempted to coerce him into dropping charges he had filed against Offner with the Montgomery County District Attorney's Office. Offner fired DeFelice. The Roofers Union did not assist DeFelice. Indeed, Offner pleaded guilty to two misdemeanor counts concerning the DeFelice matter and was ordered to pay for DeFelice's ruined car. [N.T. 760–762, 863–874, Govt. Exh. 12B].

112. In 1985, Union member Rip Kinkade became involved in a card game, at the end of which he owed a substantial sum of money to an organized crime figure. Traitz was convicted in the criminal case of extortionate collection of credit by reason of his efforts in collecting payment from his supposed colleague and fellow Union member Rip Kinkade for organized crime figures. The pertinent tapes from the criminal case evidence the divided loyalty Traitz felt and demonstrated in such matters. [Govt. Exh. 4; Tape 92].

I. *The December 1987 Election Of Officers*

113. The Roofers Union decided to conduct an election to replace the officers who had been convicted on November 23, 1987.

114. The American Arbitration Association ("AAA") was engaged as an impartial agency to oversee the election process, including the nomination meeting held on December 2, 1987. [N.T. 1719–1721].

115. The "Crosley slate" in the December 1987 election was as follows:

| | |
|---|---|
| Business Manager | Joseph Crosley |
| President | Thomas Pedrick |
| Vice–President | Jack Conway |
| Recording Secretary | David McBride |
| Executive Board | John Devenney |
| | Ed Smith |
| | Dan Conway |
| | Mark Goodwin |
| | Mike O'Malley |

[Exhs. D–6, 20; N.T. 1002–1006].

116. Joseph Crosley is the brother of defendant Robert Crosley, a former business agent who was one of the thirteen convicted on November 23, 1987. [N.T. 1565–1566; Govt. Exh. 2]. Thomas Pedrick and John Devenney were members of Traitz's "SWAT Team," a group of "tough guys" occasionally sent to terrorize recalcitrant employers. [Govt. Exhs. 16B, 16C, 16T–1, 16T–2]. Mark Goodwin is a former boxer who was trained by Traitz at the Montgomery County Boys Club and who lived with the Traitz family for a time and has been involved in payments to judges that were part of the racketeering enterprise established in the criminal case. [N.T. 1482–1483; Govt. Exh. 4, Tape 230].

David McBride is the brother of Gary McBride.

117. Local 30 member Sullivan, a former Union shop steward who had been appointed by Traitz as an instructor at the Roofers Union apprenticeship school, organized an opposition slate to run against the slate headed by Joseph Crosley. The "Sullivan slate" was as follows:

| | |
|---|---|
| Business Manager | Michael Sullivan |
| President | William McAndrews |
| Vice–President | Dan McNeill |
| Recording Secretary | Bob Dunphy |
| Executive Board | George Kuc |
| | George Lees |
| | Don Powers |
| | Tim Roach |
| | Mike McKenna |

[Govt. Exh. 24; N.T. 588–590, 1002–1006].

118. David McCullough, brother of the late John McCullough, was also a candidate for business manager, but he did not figure significantly in the December 1987 election. [Def. Exh. 20].

119. On December 2, 1987, the day of the nomination meeting, Mangini, who had been acting as business manager due to the house arrest of Traitz, learned that Sullivan planned to run against Joseph Crosley, and fired Sullivan from his job as apprenticeship school instructor. Mangini also fired Richard Bozzi, the head of the apprenticeship school because he was a political supporter of Sullivan. [N.T. 591–595].

120. The nomination meeting for the December election occurred on the evening of December 2, 1987, at McCullough Hall, on the 6300 block of Torresdale Avenue, Philadelphia, which is within one block's distance of the 6447 Torresdale Avenue Union Hall.

121. The members of the Sullivan slate, together with presidential candidate William McAndrews ("McAndrews"), arrived at the meeting with a group of supporters and entered McCullough Hall shortly before the meeting. As McAndrews entered McCullough Hall, Schoenberger (despite having been convicted nine days earlier in federal court) threatened to punch him, saying he was "going against Stephen," an obvious reference to Traitz. [N.T. 1011–1017].

122. Schoenberger and McAndrews talked for about ten minutes, during which Schoenberger threatened McAndrews with "an ass kicking," breaking his bones, putting him "in a fucking body cast," and "I'm going to fucking kill you." During this time, Donnie Sherman, a 340 pound former boxer who was also part of the Traitz group, spoke of McAndrews repeatedly, also threatening him in similar profane and abusive language. [Govt. Exhs. 16T–1, 16T–2, 16B, 16C; N.T. 1015–1019].

123. McAndrews was subjected to further threats from Schoenberger during the nomination meeting, and was bumped in an offensive fashion by supporters of the Crosley slate. Schoenberger also intimidated a Sullivan slate supporter into not distributing his campaign literature at that meeting. [N.T. 1020–1025, 1076, 1101, 1118].

124. During the election campaign, convicted business agent Daly threatened Sullivan, McAndrews and Sullivan slate supporter Charlie Slenner ("Slenner"). Daly and/or his associates also damaged Slenner's car, and Daly threatened Slenner with loss of his job on account of his opposition to the Crosley slate, which Daly supported. [N.T. 1026–1028, 1082–1086].

125. Roofers Union officials also removed other Union members opposed to the Crosley slate from their shop steward positions or barred them from obtaining work through the Union's Hiring Hall. Convicted business agent Cannon in effect campaigned for the Crosley slate at a jobsite on Union time, in violation of federal law. [N.T. 1079–1082, 1397–1399]. Two Sullivan supporters were refused a work reference from the Union Hiring Hall.

126. Sullivan supporters received anonymous telephone threats during the campaign. [N.T. 1063–1068, 1087].

127. On December 21, 1987, the AAA conducted the election of officers. Out of approximately 1500 eligible members, 1046 voted as follows:

| | VOTES |
|---|---|
| **BUSINESS MANAGER** | |
| Joseph M. Crosley | 757 |
| Michael H. Sullivan | 242 |
| David McCullough | 32 |

|                     | VOTES |
|---------------------|-------|
| **PRESIDENT**       |       |
| Tom Pedrick         | 732   |
| Bill McAndrews, Sr. | 297   |
| **VICE PRESIDENT**  |       |
| Jack Conway         | 752   |
| Danny McNeill       | 267   |
| **RECORDING SECRETARY** | |
| David McBride       | 737   |
| Bob Dunphy          | 277   |
| **EXECUTIVE BOARD** |       |
| Johnny Devenney     | 719   |
| Edward Smith        | 685   |
| Dan Conway          | 739   |
| Mark Goodwin        | 712   |
| Mike O'Malley       | 710   |
| George Kuc          | 239   |
| George Lees         | 249   |
| Joseph Mulraney     | 112   |
| Donald Powers       | 241   |
| Tim Roach           | 239   |
| Mike McKenna        | 262   |

128. Several members of the Sullivan group who had made it known that they were to testify at this trial, later received anonymous threatening phone calls up to twelve hours before their appearance in court. The purpose of these calls was to suppress truthful testimony from Union member-witnesses. Karen McAndrews, the wife of William McAndrews, and Sullivan slate supporter Patrick Costello testified as to such phone calls. [N.T. 1067–68, 1127].

129. Similar intimidation occurred in the criminal case when Leroy Owens, a boxer and the adopted son of Traitz, together with a Traitz neighbor, tried to threaten one of the jurors. [Govt. Exh. 3, Crim. N.T. 3079–3089]. Several roofers also testified in this case about attempts by the Traitz group to intimidate them in other criminal cases. [N.T. 432–39, 549, 586–87].

130. Since taking office on December 21, 1987, the current officers of the Roofers Union have reappointed the following former business agents:

  Joseph Kinkade
  Gary McBride
  Phillip Cimini
  Edward Gregory
  Charles Murtaugh
  Mitchell Henderson

Newly elected officers Thomas Pedrick, David McBride and John Devenney were also appointed business agents. [N.T. 1478–1481].

131. Joseph Kinkade, Gary McBride, Cimini and Gregory are recommended subjects of criminal charges in a Pennsylvania investigating grand jury presentment issued November 23, 1987. [Govt. Exh. 5]. Murtaugh has a criminal record and has spent time in prison. [Govt. Exh. 44; N.T. 1323–1325]. Henderson was a member of the Traitz "SWAT Team." [Govt. Exhs. 16B, 16C, 16T–1, 16T–2].

132. The thirteen officials convicted on November 23, 1987, have now been removed from office by the newly elected slate, an action that would have been accomplished by operation of law at time of sentencing in the criminal case. 29 U.S.C. § 504.

133. The nine Roofers Union members who hold office by virtue of the December 1987 election are long time associates and allies of the thirteen defendants convicted on November 23, 1987. This is established by their participation in unlawful activities prior to holding office; by the Traitz group's vocal and physical support during the December 21, 1987 election; and by their reappointment of the same business agents that had served the Traitz group during much of the corrupt regime that led ultimately to their conviction. In a tape recorded conversation with then Common Pleas Court Judge-elect Esther Sylvester on December 20, 1985, Traitz stated that with respect to running for office in the Roofers Union, "we don't have no problems because we hand our leadership right over ... we're dictators...." [Govt. Exh. 4; Tape 231, pp. 5–7]. Further, the new Union leaders promoted a rally around the federal courthouse on January 21, 1988, the night before most of the thirteen convicted former officers were sentenced. There is no evidence or even suggestion that the present leadership has repudiated or condemned the corruption of the past. [N.T. 1349–1359, 1401].

134. Current business manager Joseph Crosley and executive board member Mark

Goodwin invoked their Fifth Amendment privileges when they took the witness stand in this action. [N.T. 1474–1476, 1554–1572]. Under the American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO") Codes of Ethical Practices [Govt. Exh. 48], adopted as the measure of proper trade union practices and conduct by the Roofers International Constitution [Govt. Exh. 20A, p. 33], Joseph Crosley and Mark Goodwin have "no right to continue to hold office ... [o]therwise, it becomes possible for a union official who may be guilty of corruption to create the impression that the trade union movement sanctions the use of the Fifth Amendment, not as a matter of individual conscience, but as a shield against proper scrutiny into corrupt influences in the labor movement." [Govt. Exh. 48, p.12].

### J. Fear Of Attending Meetings At The Union Hall

135. It is clear to the court that many members of the Union as well as many contractors and subcontractors who are approached by the Union and asked to use Union workers fear attending meetings at the Union Hall. Their fear is that if they go to the Union Hall to resolve a dispute or problem or to negotiate a contract they will be outnumbered, intimidated, threatened with physical violence and/or physically beaten.

136. The court finds that such fear is actual, legitimate and well-founded.

137. Such fear stems from, *inter alia:* (1) the undemocratic and brutal policies and practices of the former officers of the Union; (2) the perception that at least some of the corrupt former officers are still running the Union; (3) the failure of the newly elected officials and appointed business agents to repudiate the physically violent and otherwise coercive policies and practices of the Union's corrupt former officers; and (4) in some cases, the permanent physical and mental scars of outnumbered persons who suffered physical beatings at the hands of hired goons and trained boxers at the Union Hall.

138. The court must aid the Union to put a stop to the perception of the misuse of the Union Hall as a feared chamber of terror or a beating gauntlet and elevate it to a respected place of legitimate business.

### K. The Need For A Remedy

139. The evidence presented to this court in the preliminary injunction hearing establishes in a convincing and persuasive form that the racketeering activity of the individual defendants over the past twenty years extends far beyond that for which they have been charged, convicted and sentenced. Furthermore, the evidence establishes the involvement of many more officers, agents, members and accomplices of the Roofers Union than have been convicted thus far. Indeed, the names of many of the perpetrators of many of the threats, violent acts and crimes of extortion testified to are not known to the victims, although their affiliation with the Union is clear.

140. The court finds that persons who have been active in the criminal program of the Union in the past remain in influential positions within the Roofers Union, and have not all been removed by the recent election. [N.T. 1349–1357].

141. Abuses of the past are not likely to stop with the removal of the thirteen individual defendants from their positions. The systematic practice of functioning on a basis where violence and blatant violations of law were official Union policy over the last twenty years creates a substantial likelihood of continued violations and the *perception* by people in the industry as well as members of the Roofers Union itself that such violations will continue. [N.T. 1349–1377].

142. This Union has been dominated over more than twenty years by a creed of violence, unlawfulness and defiance of authority. The imposition of the creed by force, fear and intimidation upon the roofing industry and much of the Union membership prevents the Union from quickly restoring itself to the role that its current and future membership expects and the law demands.

143. Convicted officials have been involved in the nominating and election process for new Union officers who now hold office. The firing of candidate Sullivan from his Union job the day after he announced his candidacy, and similar job retaliation against Sullivan supporters, as well as the harassment and intimidation of Sullivan and his supporters by persons loyal to the old corrupt regime are evidence of this. [N.T. 1349–1364].

144. The court recognizes that roofing work is sometimes extremely difficult, dangerous, dirty, transitory and that the finished product is not seen by many, so persons employed in the roofing industry often do hard work with little recognition for its quality. This is one reason that the court finds that a labor union which roofers can be proud of would be an important institution. Under its past leadership the Union was reduced to a mere shell that lost sight of its legitimate goals and allowed the improper means it utilized to consume it. Through the injunctive relief outlined herein the court seeks to restore or maybe create for the first time honest pride in the Union. This labor organization is not capable of curing its problems without the intervention of one or more outside authorities in a form, and for such duration as will provide it with the best chance, if it has one at all, of avoiding dissolution.

## L. Removal Of Individual Defendants From The Industry

145. The thirteen individual defendants have been sentenced to various prison terms [Finding of Fact 92], and some are released on bail pending appeal.

146. These convicted defendants must be barred from the roofing industry within the jurisdiction of Local 30/30B, pending their appeals and possibly after service of their sentences, to sever their influence on the Union, formal and informal, to create the perception among the membership and the industry that their influence and practices have been terminated, and to avoid undermining the actions of the Decreeship. Their participation in the criminal RICO conspiracy that has dominated the Union

for the last twenty years justifies this relief. The task of creating conditions permitting internal democracy requires the removal of the individual defendants from the industry in the Union's territory so that members and contractors can believe that the old practices are ended. [N.T. 1375–1377, 1414–1431]. Removal of the individual defendants is also necessary in order to aid the Union to undo its former leadership's deliberate creation over the past twenty (20) years or so of the "break your back" and "beat you up" type of unionism.

## M. Selective Enforcement Of Roofers Union Pay Rates

147. The structure of the Roofers Union is that Local 30, the older part of the Union, is *intended* to cover commercial work, whereas Local 30B is *intended* to cover residential non-commercial work. This organizational form, however, has been rearranged and exceptions have often been made so that in some cases the exceptions swallowed the rule. Thus many contractors have been and remain confused as to whether they are expected by the Union to use Local 30B members or Local 30 members. Hopefully the newly elected leaders of the Union can clear up this confusion created by the old corrupt regime.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 18 U.S.C. § 1964(a).

2. Section 1964 of the RICO statute gives the district court equitable powers to prevent and restrain violations of 18 U.S.C. § 1962. Section 1964 provides in pertinent part:

(a) The district courts of the United States shall have jurisdiction to prevent the [sic] restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor

as the enterprise engaged in, the activities of which affect interstate or foreign commerce; *or ordering dissolution or reorganization of any enterprise,* making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

18 U.S.C. § 1964(a), (b). (Emphasis added). This provision was utilized by one district court to remedy abuses by union officials by establishing a trusteeship [6] and enjoining individuals from any interference in union affairs. *United States v. Local 560, Int'l. Bhd. of Teamsters,* 581 F.Supp. 279 (D.N.J. 1984), *aff'd,* 780 F.2d 267 (3d Cir. 1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). Section 1964(a) confers upon the court discretionary power to make use of a wide range of civil remedies. *United States v. Local 560, supra,* 780 F.2d at 294.

The House Judiciary Committee's final report states as follows:

[Section 1964(a)] contains broad provisions to allow for reform of corrupted organizations. Although certain remedies are set out, the list is not meant to be exhaustive, and the only limit on remedies is that they accomplish the aim set out of removing the corrupting influence and make due provision for the rights of innocent persons.

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S. Code Cong. & Ad. News 4007, 4034; *United States v. Local 560, supra,* 780 F.2d at 295. Indeed, the United States Supreme Court held in *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) that:

RICO is to be read broadly. This is the lesson not only of Congress' self-con-

sciously expansive language and overall approach, see *United States v. Turkette,* 452 U.S. 576, 586–587 [101 S.Ct. 2524, 2530–2531, 69 L.Ed.2d 246 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91–452, § 904(a), 84 Stat. 947.

*Sedima v. Imrex Co., Inc., supra,* 473 U.S. at 497–498, 105 S.Ct. at 3286. *See also, Russello v. United States,* 464 U.S. 16, 27, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983).

■ 3. Preliminary injunctive relief may be granted if the United States established by a preponderance of the evidence that (1) there are serious violations of a statute affecting the public interest, and (2) there is a likelihood that the violations will continue absent injunctive relief. The United States' burden of proof is limited because of the legislative history of the RICO statute. In enacting § 1964, Congress legislated in the public interest to remove the criminal influence from legitimate business. In this action the United States represents the public interest defined in the RICO statute. Where the United States demonstrates a violation of a statute that embodies public policy interests, and some likelihood that the violations will continue, the court should grant preliminary relief without further inquiry. *Government of Virgin Islands Dep't of Conserv. and Cultural Affairs v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir.1983); *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979); *Securities Exch. Comm'n v. Management Dynamics, Inc.,* 515 F.2d 801, 808–809 (2d Cir.1975). The "threatened violation of the law here is sufficient public injury to justify the requested relief ... No further showing need be made by those directed to enforce [the congressional pronouncement] than that it is being violated or threatened with violation." *United States v. Ingersoll–Rand Co.,* 218 F.Supp. 530, 544–545 (W.D.Pa.), *aff'd,* 320 F.2d 509 (3d Cir.1963);

---

**6.** A "trusteeship" means the placement into the seat of the Union's ultimate authority, a "trustee," or "trustees" who displace existing leadership at all levels of the organization at its principal office and in the field.

*accord, United States v. Siemens Corp.,* 621 F.2d 499, 506 (2d Cir.1980).

There are a variety of factors which the court has examined to determine whether the defendants will continue to violate the statute. The first factor is a pattern of past violations, which "is highly suggestive of the likelihood of future violations." *Securities Exch. Comm'n v. Management Dynamics, supra,* 515 F.2d at 807; *accord, United States v. Local 560, supra,* 581 F.Supp. at 336–337; *United States v. Cappetto,* 502 F.2d 1351 (7th Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *Commodity Futures Trading Comm'n v. Hunt, supra,* 591 F.2d at 1220.

The second factor is public denial that the conduct in question was unlawful. *Id.* Third, is the continued participation by the defendants in the business in which the violations occurred. *Securities Exh. Comm'n v. Commonwealth Chem. Sec.,* 574 F.2d 90 (2d Cir.1978). Fourth, is direct evidence that the defendants or their allies have planned to continue their unlawful activity in spite of prosecution or removal from their positions of authority.

4. The United States has, by the evidence of the convictions of the defendants, established that they have conspired to conduct, and have succeeded in conducting, the affairs of the Roofers Union through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(d) and (c), respectively. The evidence presented to this court establishes, by an overwhelming preponderance of the evidence, that the United States is entitled to injunctive relief.

■ The RICO statute prohibits a "person" from conducting or conspiring to conduct, the affairs of an "enterprise" through a "pattern of racketeering activity." 18 U.S.C. § 1962(c), (d).[7] The individual defendants are "persons," 18 U.S.C. § 1961(3),[8] within the meaning of the statute and the Roofers Union is an "enterprise." 18 U.S.C. § 1961(4).[9] *United States v. Local 560, supra.*

■ 5. The individual defendants' convictions in *United States v. Traitz* collaterally estop them from denying that they conducted the affairs of the Roofers Union through a pattern of racketeering activity. 18 U.S.C. § 1964(d).[10] The federal criminal jury there found that thirteen officers and business agents of the Roofers Union had conspired to conduct and did conduct the affairs of the Roofers Union through a pattern of racketeering activity. The pattern consisted of extortion, bribery of judges and other public officials, embezzlement from a Union employee benefit plan, soliciting kickbacks from a provider to a Union employee benefit plan, and mail fraud. The crimes proved in *United States v. Traitz* occurred primarily in 1985 and 1986, although certain bribes and kickbacks took place in 1983 and 1984.

The court agrees with the United States that in this civil RICO action, the racketeering activity and the criminal conspiracy proved are actually broader, deeper and of

---

7. 18 U.S.C. § 1962(c), (d) provide as follows:
   (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
   (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections[2] (a), (b), or (c) of this section.

   · · · · ·

   [2] So in original. Probably should be "subsection."

8. 18 U.S.C. § 1961(3) states:

   (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

9. 18 U.S.C. § 1961(4) states:
   (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

10. 18 U.S.C. § 1964(d) provides as follows:
    (d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

longer duration than that proved in the criminal prosecution. The United States has established that in 1968 the Roofers Union began to threaten and coerce roofing contractors to sign collective bargaining agreements with the Roofers Union. Violence and arson were used when the threats and warnings were not heeded and sometimes even without warning. This pattern has continued, in varying degrees, over the past twenty years and was also often directed to contractors who signed a collective bargaining agreement since the leadership of the Roofers Union allowed violence to be a substitute for negotiation, arbitration, and alternative methods of dispute resolution. In its findings of fact the court found that the Union, through the policies and practices employed by its leaders, engaged in terrorism. To use the metaphor of one national expert on terrorism, "terrorism is theatre." [11] It is not what terrorists do so much as it is the *perception* they create. By physically beating one person, a group practicing terrorism can scare and influence a thousand. Over the last twenty years the former leaders of the Union have managed to create among the membership and those in the industry the perception that one's person and property will be injured by the Union unless one accedes to the Union's demands. Such perceptions, once created and in place, are not easily changed.

The routine exercise of threats, violence and vandalism against non-Union contractors was not part of the government's case in *United States v. Traitz*. The criminal trial dealt with violence but not to the extremes heard in the civil case. Accordingly, the racketeering activity here is both longer in duration and broader in variety since it covers more crimes committed by more Union officials and more Union agents.

■ 6. The statutory estoppel provided in 18 U.S.C. § 1964(d) operates against the Union defendant as well, because the Union (the principal) is estopped and bound by

the actions of its agents (the Union officials and representatives).

■ 7. The use of Union funds to pay for bail bonds, criminal defense and related costs incurred in criminal cases against Union officials is a breach of the Union officers' fiduciary responsibilities under the LMRDA, 29 U.S.C. § 501, and constitutes illegal disbursements. *Highway Truck Drivers and Helpers Local 107 v. Cohen*, 215 F.Supp. 938 (E.D.Pa. 1963), *aff'd*, 334 F.2d 378 (3d Cir.), *cert. denied*, 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964); *Highway Truck Drivers and Helpers Local 107 v. Cohen*, 182 F.Supp. 608 (E.D. Pa.), *aff'd*, 284 F.2d 162 (3d Cir.1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed. 2d 744 (1961); *Kerr v. Shanks*, 466 F.2d 1271, 1277 (9th Cir.1972); *Morrissey v. Segal*, 526 F.2d 121 (2d Cir.1975).

8. There is a substantial likelihood of future RICO violations unless the court grants preliminary relief.

9. The violations of the RICO statute established at the hearing constitute serious injury to the public policies embodied in RICO of preventing corrupting influences from controlling legitimate Union activities.

10. The United States has established a substantial probability that it will succeed at trial of this case on the merits.

11. At the present time the election conducted on December 21, 1987, and its results will stand and not be voided.

12. The court concludes that the government has carried its burden of establishing its right to preliminary relief.

DISCUSSION

■ The federal criminal trial proceedings are completed; the convicted defendants are in a variety of stages of that process with some in jail and others on bail. Various statutes have come into play that prevent continued influential involvement of elected figures in the Union. The Commonwealth of Pennsylvania has filed multiple felony charges charging criminal conduct similar to that heard in the federal

---

11. Brian Jenkins, *International Terrorism: A New Kind of Warfare*, Rand Paper No. 5261 at

p.4 (June 1974).

case. Criminal convictions are being sought there against the same defendants and presumably, if convictions result, long prison terms will be sought. There are a number of civil proceedings that have fallen into this channel of litigation including a recent civil suit by the current leadership suing its former attorney for thousands of dollars in damages for providing allegedly improper advice. There will no doubt be other suits, claims, and charges leveled against the individual defendants and the Union.

In the midst of this foray there is this civil suit and in this rush to judgment, everything has been hurled against the Union and the individual defendants. Unhappily for the defendants, it is nearly all relevant and it has been presented to this court virtually unchallenged. This dilemma to the defendants does not appear to result from any sort of trial strategy, but rather a basic inability to offer any meaningful evidence that would contradict the government's evidence, all of which is credible and much of which is documented. Key portions of the evidence have been convincingly corroborated, as in the many instances where through electronic surveillance, the defendants' own behavior and conversations prove the case against them.

The options of the court in the realm of this firestorm of activity are varied and difficult principally because they cannot be considered separately but must be considered in relationship to each other. The options are as follows.

The first, and the easiest to address, because it is fully justified by the overwhelming weight of the evidence, is to dissolve the Union and make an equitable distribution of its assets. This the court will not do—at least for now.

Secondly, the option sought by the government is the imposition of a "trusteeship." Experience has shown that court-imposed trusteeships have not worked as well as expected. A trusteeship has the advantage of providing an instant tangible structure that promptly functions in making changes and doing things. It also has the advantage of being separated from the court, thus giving the illusion of independence and opportunity. In a case where financial problems are the chief source of trouble in a Union, or where entrenched incompetence in leadership temporarily undermines the rights of the membership, a trusteeship may be the best choice. That is not the case here, where the court is confronted by a Union that has existed for many, many years as a criminal-dominated organization. The shortcoming of a trusteeship, however, is clearly the distasteful and unworkable act of forcing an authority figure on the existing Union leadership and membership, who they are required to be loyal to, and indeed, expected to like. History has shown that this has rarely worked in the political world and there is no reason to expect it to work in the labor Union circumstance now before the court, especially where the authority figure is replacing individuals and policies that have theretofore in great measure been supported, enforced, or at least tolerated by the very membership who would be ruled over by the unwanted trustee. Stated differently, this Union *may* have a chance to succeed, but it must change its ways because it is convinced it must and not because it is forced to. The court does not believe a trusteeship is the answer.

Another choice the court has is to allow the Union to function as it previously did under its newly elected leadership with the court serving, as the defendants' suggest, in the role of "monitor" or watchdog. This obviously has the advantage to the Union of allowing it to exist and function as if nothing had happened. The defendants urge this on the court. Their argument is that the Union has newly elected officers and that no harm can result if the court is watching the activities and the management of the labor organization very closely. The trouble with this approach, even though it has succeeded in other cases, is that the development and misuse of power by and through Local 30/30B has endured for so long and is so deep-rooted that even the current leadership, who are necessary figures in the day-to-day functioning of the Union, are also products of the old style which, in fairness to the current leadership,

was the only way to go if one wanted to become a leader during the McCullough–Traitz era. For the immediate future, they can only be expected to follow the course that the old regime did. Indeed, evidence has been shown in this very case that following the conviction of the previous leaders some of the present officers, rather than repudiate the old regime, embraced it, supported it, and marched for it. These instincts signal an intention by the new team to proceed into the future with the old ideas and policies in place but, with reluctance, no doubt born out of necessity, to do so to the brink, but not beyond, the violation of the law. This policy, of course, is a serious and fundamental misunderstanding of the purpose of the laws that have been violated, the remedial nature of the court's role in these equity proceedings, and a miscalculation of the resolve of the court to fulfill its responsibility. What must be understood here is that the future of this Union and its membership depends on what flows into the vacuum. There must be a genuine moral revival in the wake of moral collapse.

It is useful at this point of the discussion to emphasize the importance in American society of preserving—where possible—the dignity and individuality of every person who wants to work, by allowing that person to become a functioning part of a labor organization created by law, protected by law, and operating within the law.

As the court sees it, there must be a blend that will both (a) accommodate the requirement that the court provide a strong remedial role in the functioning of Local 30/30B short of a trusteeship; and (b) demonstrate a tolerance for the existence, during this period, of Local 30/30B as a labor Union operating as a meaningful, necessary institution that the membership can truly belong to, be a part of, have a voice in, be loyal to, and be led by persons chosen through a genuine democratic process within the Union. This envisions that the members will be entitled to a chance to elect leaders who they will be loyal to and respect, and who will be received by the industry and the community with wholesome, lawfully-earned respect. The court

believes that can be achieved by leaving the Union institution and its present leadership in place, but then removing from Union control those areas of *activity* which the Union has misused in the past. For example, the evidence has shown that the Union does not have a grievance procedure. As primitive as this sounds, it was plainly no accident in the court's view. Local 30/30B leadership expected to settle grievances with baseball bats on the street corners, on roofs of buildings, and in the early morning hours with firebombs and similar destructive devices. Encounters at the Union headquarters with Union officials, usually on a 3, 4, or 5 to 1 ratio in favor of the Union with recalcitrant employers, was a primary technique to settle grievances. *See, e.g., Findings of Fact* 79, 81, 83 and 87. This barbaric practice was the only "grievance procedure" permitted. This obviously cannot be allowed to continue. The court, by Decree, will require the Union and the employers to adopt a grievance procedure, subject to court approval, that will be the exclusive grievance procedure to resolve disputes between the Union and its members and employers. If this grievance procedure is by-passed and past practices are resorted to, in addition to such a course being a violation of law, it will be a violation of the Decree as well. There are other subjects, including negotiations for collective bargaining agreements, control of benefit funds, dues, hiring practices, and the like, that the court believes can be removed from exclusive Union control without interfering with other Union activity. The court is convinced this can be accomplished by Decree and therefore rejects the plaintiff's request for a trusteeship and the Union's suggestion of a monitorship. Instead, the court will impose what shall be termed a "Decreeship." This will simply mean that the Union will continue to function in the manner hereafter more carefully described, with its democratic processes in place, its leadership in place, but subject to the authority of a Decree of court. The Decree will have a number of specific requirements that will result in the replacement of certain improper Union practices

of the past, the prohibition of some others, and participation by the court with the Union in others.

The principal features of the Decree will be as follows:

### 1. *Chief U.S. Court Liaison Officer*

The court will appoint a liaison officer who will function under the Decreeship and assure compliance with all of its terms. He will have the authority, upon application and approval of court, to hire such assistants and support services as will be needed to fulfill his responsibilities under the Decree.

### 2. *Audit*

The court will order an immediate audit of all accounts of Local 30/30B and any affiliated entity.

### 3. *Collective Bargaining*

One of the most serious areas encountered in the criminal trial and more widely developed at the civil trial was the use of fear, intimidation, violence, and other criminal conduct in respect to the Union's securing employers to sign or conform to collective bargaining agreements. This Opinion details a number of those episodes. The function of securing collective bargaining agreements with employers will continue to remain, under the Decreeship, with the Union. The right of the Union and employers to bargain collectively will not be interfered with but the court will join the process as an observer under other conditions intended to insure that reoccurrences of past practices will not take place.

### 4. *Convicted Defendants*

Convicted defendants, of course, are subject to certain statutory sanctions in connection with their criminal convictions. The court intends in its Decree here, however, to broaden that feature of this case under its general equity power. It must be remembered that the wrongdoing proved in the civil case was much more extensive than that involved in the criminal case. The court intends that the Decree assure that former convicted defendants play no part in this Union from any position of influence. The evidence is replete with uncontradicted evidence of intentional conduct by all of the convicted defendants who are also named defendants in the civil case. Indeed, the leaders depended upon the presence of a loyal membership as they forced their will upon many other persons and organizations in and out of the roofing industry. These defendants used thousands of dollars of Union funds for their own benefit and for illegal purposes. They engaged in favoritism to satisfy personal desires putting those ahead of the Union. They exposed the Union to financial ruin by wasting assets and resources in the furtherance of personal relationships with members of organized crime and the goals of organized crime figures. The Union leaders also betrayed their membership in a series of instances having to do with relaxing contract requirements based on favoritism and personal whim. It will be recalled that certain favorite contractors were permitted to perform commercial work at the lower residential hourly rates, thereby depriving those workers of what they were entitled to under the contract.

The testimony at the hearing advanced by the defendants was in regard to their fear that they will be deprived of employment in the roofing industry if this court interferes with their opportunities to work once they are free to seek work again following discharge from prison. Testimony was offered concerning educational and skill limitations and longevity in the roofing industry in support of their position. This was offered to rebut the suggestion that they be barred from roofing since to do so would be tantamount to depriving them indefinitely of the ability to earn a living for themselves and their families. Again, the court must balance between the damage these persons have purposely and intentionally caused through their criminal conduct and which, because of its longevity, was known to them while they were engaging in it and their individual rights, despite their conduct, to free themselves of the burdens of the past and generate a meaningful life for the future for them-

selves and their families. It is difficult to have considerable compassion for these persons who knew at the time they were engaging in their improper conduct that there could come a time when they would be severely punished, either by prison terms or other court sanctions affecting their employment. They certainly knew that those penalties would fall upon their families and affect them adversely. Even so, unless restrictions on employment opportunities would have some acceptable purpose here, simply to impose such restrictions merely because they are being asked for would be unjust. This is especially so in view of the individual punishments now being experienced from the criminal case by reason of their criminal convictions. Additionally, there is uncertainty on this employment question because it is not known when these individual defendants will be permanently free to seek employment, although, in some cases, they are free now pending their criminal appeals.

With this background, the court's Decree in this regard will consider three principal points. First will be concerns regarding the position that any of these defendants should be permitted to hold; secondly, consideration must be given to the duration of any restriction; and, thirdly, the place and the conditions where employment will be permitted must be addressed.

### 5. *AFL–CIO Codes of Ethical Practices*

■ Under the AFL–CIO Codes of Ethical Practices [Govt. Exh. 48], adopted as the measure of proper trade union practices and conduct by the Roofers International Constitution [Govt. Exh. 20A, p. 33], newly elected business manager Joseph Crosley and newly elected executive board member Mark Goodwin, who both invoked their Fifth Amendment privileges at the injunction hearing [N.T. 1375–1377, 1455–1473] have "no right to continue to hold office." [Govt. Exh. 48, p. 12]. The AFL–CIO Codes of Ethical Practices booklet contains "AFL–CIO Executive Council Statement on the Use of the Fifth Amendment

in Investigations of Racketeering" which provides in pertinent part:

It is the firm policy of the AFL–CIO to cooperate fully with all proper legislative committees, law enforcement agencies and other public bodies seeking fairly and objectively to keep the labor movement or any other segment of our society free from any and all corrupt influences. This means that all officials of the AFL–CIO and its affiliates should freely and without reservation answer all relevant questions asked by proper law enforcement agencies, legislative committees and other public bodies, seeking fairly and objectively to keep the labor movement free from corruption. We recognize that any person is entitled, in the exercise of his individual conscience, to the protection afforded by the Fifth Amendment and we reaffirm our conviction that this historical right must not be abridged. It is the policy of the AFL–CIO, however, that *if a trade union official decides to invoke the Fifth Amendment* for his personal protection and to avoid scrutiny by proper legislative committees, law enforcement agencies or other public bodies into alleged corruption on his part, *he has no right to continue to hold office in his union.* Otherwise, it becomes possible for a union official who may be guilty of corruption to create the impression that the trade union movement sanctions the use of the Fifth Amendment, not as a matter of individual conscience, but as a shield against proper scrutiny into corrupt influences in the labor movement.

[Govt. Exh. 48, p. 12 (Emphasis added); *Finding of Fact* 134].

The Decree will address the effect, if any, of this standard in view of the exercise by certain of the named defendants of their Fifth Amendment privilege against self-incrimination.

### 6. *Roofing Contractors' Association*

The roofing contractors are encouraged, but not required, to promptly form a *meaningful* employers association that should seriously and firmly operate to deal effec-

tively with the Roofers Union. The court believes the absence of such a meaningful organization was an important reason for the intimidating one-sidedness of the employer-labor relationship in the roofers industry in this city for the past 20 years. While certain of those employers were courageous and resisted Union pressures as demonstrated by the testimony at the hearing, many others succumbed, albeit understandably, and that was counter-productive to overall employers' interests and the community's interest.

An appropriate Decree will be entered.

### DECREE

AND NOW, TO WIT, this 23rd day of May, 1988, in accordance with the accompanying Memorandum which contains the court's Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a), IT IS ORDERED AND DECREED as follows:

1. The motion of the United States for a preliminary injunction is *granted to the extent hereafter set forth.*

2. The motion of the United States for appointment of a trustee *pendente lite* is *denied.*

3. The Roofers Union election conducted on December 21, 1987, and its results will remain in effect until further Order of court.

4. Pursuant to the authority provided in 18 U.S.C. § 1964(a), a "Decreeship" is imposed upon the Roofers Union.

5. The court will appoint a CHIEF U.S. COURT LIAISON OFFICER–LOCAL 30/30B who will serve as the principal enforcement officer of all provisions of the Decree.

6. The court will appoint Deputy Liaison Officers in such number and at the time as needed, to carry out the requirements of the Decree.

7. By reason of the conduct found to have occurred, all of the individual defendants will, by this Decree, be barred until further Order of court from holding, occupying, or controlling any position of leadership or influence in respect to any matter within the jurisdiction of Local 30/30B or any of its affiliated entities. This includes, but is not limited to, a prohibition against having any, or holding themselves out as having any, office, rank, or position of influence or control of any kind in Local 30/30B, or any affiliated entity. Any person or entity that causes or allows or attempts to cause or allow any of the individual defendants to violate any provision of this Decree shall be deemed by the court to be in violation of the Decree. Each of the individual defendants is, until further Order of court, prohibited from engaging in employment in the roofing or related construction industries, in any capacity, within the geographical area of the jurisdiction of Local 30/30B as that jurisdiction existed on the day these civil proceedings were filed. The court will consider allowing employment in the roofing or related construction industries within the jurisdictional area in a non-supervisory or non-leadership role upon application to the court of any affected defendant. When reviewing any such applications, the following factors will be included among those to be inquired into and will be major considerations to the court. Further, it can be expected that the court will not allow employment in any capacity in roofing or related construction work within the territory of Roofers Local 30/30B as it existed on the date of the filing of this complaint where the following circumstances, or any combination of them, exist:

(a) On a job location where any other person is employed, full-time, in the usual course of business, who testified as a witness under oath in a grand jury, civil, or criminal court proceeding where any of the defendants or Local 30/30B was a defendant, target, or subject of such proceeding, and the employed person was a witness against any of the present defendants or Local 30/30B, or testified adverse to any of their interests.

(b) On any job location where there is, or expected to also be employed, any other defendant in this civil case, or any member of the slate of officials that was elected at

the December 1987 election of Local 30/30B.

(c) Any job location where at the time employment is being sought, there is also engaged on such job or project any of the individual, corporate, or entity contractors who testified, through individuals, officers, or employees, before the Grand Jury, at the criminal or civil trial, *whether or not* the witness at the time employment is sought, by the defendant, is still employed or affiliated with the roofing contractor for whom the witness testified.

8. Within the time to be designated by the Chief U.S. Court Liaison Officer, the Union shall report to the court the effect, if any, of the AFL–CIO Codes of Ethical Practices upon business manager Joseph Crosley and executive board member Mark Goodwin, who both invoked their Fifth Amendment privileges at the trial in this case.

9. Local 30/30B shall, within ninety (90) days of the date of this Decree convene with the appropriate employer representative group for the purpose of adopting as part of their industry-wide contract a grievance/arbitration procedure that will provide for the lawful resolution of disputes arising under the contract between labor and management in all matters touching upon the jurisdiction of Local 30/30B. If no such procedure is in effect within ninety (90) days of the date of this Decree, the court will amend this Decree to include such a procedure satisfactory to the court. Any such procedure adopted by the Union or imposed by the court, shall provide for the maintenance of adequate records respecting the filing, administration and resolution of all disputes governed by the procedure.

10. An audit of the financial condition and the affairs of Local 30/30B and all affiliated entities shall be undertaken forthwith by a designee of the court.

■ 11. The court will establish direct control of all matters within the jurisdiction of the Union that require the expenditure of any funds of the Union or any affiliated entity for the transfer of any of its assets, and all defendants are enjoined, effective with the date of this Decree, from transferring any funds, property, or interests in any assets of any kind of Local 30/30B or any of its affiliated entities, except in the ordinary course of business without the express previous written consent of the court.

■ 12. (a) Local 30/30B and any of its officers, agents, or representatives, are herewith enjoined for sixty (60) days from engaging in any negotiations with any person, corporation, or entity, which has as its purpose, in whole or in part, the entering into of a collective bargaining agreement or the renewal of a collective bargaining agreement.

(b) Commencing sixty (60) days after the date of this Decree, Local 30/30B and any of its officers, agents, or representatives, may engage in negotiations with any person, corporation, or entity, which has as its purpose, in whole or in part, the entering into of a collective bargaining agreement or the renewal of a collective bargaining agreement, but any such negotiations shall be subject to the following conditions:

(1) To the extent that such negotiations are face-to-face (as opposed to by telephone), they shall only take place at a location to be designated by a Court Liaison Officer.

(2) The Court Liaison Officer shall not be permitted to designate as the location for any face-to-face negotiating session any property owned, occupied, or controlled by Local 30/30B or any affiliated entity.

(3) The Court Liaison Officer shall not permit negotiations to take place on the roof of any building.

(4) A face-to-face negotiation session shall be deemed to be void and in violation of this Decree unless there is present at all stages of such session a Court Liaison Officer. The presiding Court Liaison Officer will not participate in respect to the content of any of the positions taken by any of the parties at a negotiation session, except to the extent that the content of such negotiation includes conduct determined by the Court Liaison Officer to be an inducement

of fear, intimidation, threats, or violence, which shall be reported to the court forthwith. Upon such event, the Court Liaison Officer shall notify the parties of his findings and intentions and suspend further negotiations. Any person, corporation, or entity with whom Local 30/30B, its officers, agents, or representatives, desires to negotiate shall have the right to conduct all or part of such negotiations by telephone without the presence of the Court Liaison Officer. Any such party, however, shall also have the right to refuse to negotiate, in whole or in part, by telephone, and such refusal shall not be deemed to be a basis by Local 30/30B, or any affiliated entity, to claim that there is a failure to bargain in good faith.

(5) Every collective bargaining agreement, or renewal thereof, shall not be effective until it is counter-signed by the Court Liaison Officer, who shall, prior to execution, assure himself and certify to the court that the agreement was entered into after good faith negotiation and not in an atmosphere of fear, intimidation, threats, or violence.

(6) No face-to-face negotiation session shall be attended by a number of representatives of Local 30/30B, or any affiliated entity, that is in excess of the number of the employer representatives, and the number of such representatives of Local 30/30B, and any affiliated entity, should not exceed three (3), except upon the advanced consent provided by the Court Liaison Officer, which consent shall be given in appropriate cases such as in circumstances associated with industry-wide bargaining.

█ 13. In order for any arbitration/grievance procedure to be approved by the court, it must contain a provision that prohibits any step in the procedure taking place on any property owned, occupied, or controlled by Local 30/30B or any affiliated entity.

14. Any Court Liaison Officer shall have the right, without prior notice, to have access to any records, wherever located, at the offices, locations and other property of Local 30/30B or any affiliated entity, and such Court Liaison Officer may designate other persons responsible to the Court Liaison Officer to have similar access. Such access shall include the right to inspect, copy, and reproduce where the Court Liaison Officer deems such activity is necessary.

15. The Union shall provide written notice to the court of all meetings, proceedings, or decisions providing for nominations and/or elections for offices or positions within Local 30/30B, or any affiliated entity, at least *sixty (60) days* in advance of any such nomination or election proceeding.

16. No individual defendant shall be paid, offered, or accept; nor shall any person or entity pay or deliver anything of value from or on behalf, or at the request of, Local 30/30B or any affiliated entity, unless on a date prior to the institution of these civil proceedings the court determines that such defendant was entitled to payment or value under some then existing lawful contractual provision, including any labor organization benefit plan.

17. The Decree shall be interpreted by the court, and its provisions shall be applied in order to protect, as much as possible, the right of Union members to fully participate in the Union affairs, including the right to vote, to assemble, to speak freely, to be treated fairly and fully in respect to their rights under the Union Constitution and By-Laws and benefit programs and the right to be represented in respect to collective bargaining and other Union matters by lawfully elected leaders of their choice. The court shall also interpret and apply the provisions of the Decree in order to protect, as much as possible, the right of employers in the roofing industry to collectively bargain and otherwise transact business and deal with Local 30/30B and any affiliated entity, free of fear, intimidation, harm, or injury to themselves, their employees, or property they control, and to carry on their business free of similar events and influences.

18. The court shall implement the Decree by the issuance of *"Decree Implementation"* Orders from time to time. The Decree shall be amended by the issuance of

*"Decree Amendment"* Orders from time to time.

19. Local 30/30B, and any affiliated entity, the thirteen (13) defendants, and all persons who are either members or associated in any way with Local 30/30B, or any affiliated entity, are expressly prohibited, in respect to any member within the jurisdiction of Local 30/30B, or any affiliated entity, from intimidating, inflicting violence, fear, or threats of personal or property damage upon any person, corporation, or entity; or attempting to do so, and in addition to such conduct in certain cases being violations of law, such conduct shall also be deemed to be a violation of this Decree.

20. This Decreeship, as the same shall be amended from time to time, shall continue until further Order of court.

21. The court retains jurisdiction of all matters respecting the existence and functioning of Local 30/30B, and any affiliated entity, as well as any person, corporation, or entity associated with Local 30/30B and any affiliated entity, in order to effectuate the goals of this Decree as it shall be amended from time to time.

22. All costs incurred in the administration of the Decreeship shall be borne by Local 30/30B, and, where appropriate, its affiliated entities.